**EQUAL ACCESS EDUCATION, et al., Plaintiffs,**

**v.**

**Alan G. MERTEN, et al., Defendants.**

**No. CIV.A. 03–1113–A.**

United States District Court, E.D. Virginia, Alexandria Division.

Feb. 24, 2004.

---

Luis Alberto Parada, Catherine Rebekkah Rowland, David M. Orta, Yohai Baisburd, Jorge Almonte, Arnold & Porter, LLP, Washington, DC, Tisha Rae Tallman, Jose Gonzalez, Mexican American Legal Defense .and Educational Fund, Atlanta, GA, for Plaintiffs/Movants.

William Henry Hurd, James V. Ingold, Jerry Kilgore, Alison Paige Landry, Maureen Fay Riley Matsen, Andrew Cameron O'Brion, Office of the Attorney General, Richmond, William Eugene Thro, Christopher Newport University, Newport News, for Defendants/Respondents.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this case of first impression, plaintiffs claim that various of Virginia's post-secondary educational institutions violate the Constitution's Supremacy, Commerce, and Due Process clauses by denying admission to illegal aliens or to persons they believe to have an "illegal," "unlawful," or "undocumented" immigration status. Threshold dismissal motions by all defendants raise a variety of dispositive issues, which are addressed here.

### I.[1]

The impetus for this suit and a focus of the complaint is the Virginia Attorney General's September 5, 2002 memorandum to all Virginia public universities and colleges, and to the Executive Director of the State Council for Higher Education in Virginia, stating that "the Attorney General is strongly of the view that illegal and undocumented aliens should not be admitted into

our public colleges and universities at all ...." *See* Commonwealth of Virginia Attorney General Memorandum, *Immigration Law Compliance Update* at 5 (Sept. 5, 2002). The memorandum also "strongly encourages school officials and all public employees in higher education to report [to the Immigration and Naturalization Service (INS)] facts and circumstances that may indicate that a student on campus is not lawfully present in the United States." *Id.* at 11. A reporting form for this purpose was attached to the memorandum to be returned to the Virginia Attorney General.

Plaintiffs further allege that the Virginia Attorney General's Office did not issue any guidelines or procedures for Virginia public universities and colleges to follow in order to implement its recommendation to deny admission to students based on immigration status. Indeed, plaintiffs point out that the Attorney General's memorandum admits "as a strictly legal matter, [that] institutions have broad discretion to decide what documentation they will request of applicants, and how they will treat applicants who are not lawfully present in the United States." *Id.* at 5. Finally, according to the complaint, the widely publicized memorandum caused Virginia's leading colleges and universities to implement, or to continue to enforce, admissions policies that deny admission to illegal aliens and to applicants believed to have an illegal or undocumented status.[2]

Given the memorandum's nature and its role as the impetus for this action, the parties' identities are understandable.

---

1. The facts recited here are derived from plaintiffs' second amended complaint. As required in the analysis of dismissal motions, these facts are assumed to be true for purposes of the motion. *See Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993).

2. Only Northern Virginia Community College, it appears, initially declined to follow or adhere to the memorandum, but then more recently reversed course.

There are now three remaining plaintiffs,[3] one association and two individuals, all of whom claim to be adversely affected by the admissions policies of Virginia's colleges and universities relating to applicants who are, or who may be believed to be, illegal aliens.

Plaintiff Equal Access Education (EAE) is an unincorporated association whose mission is (1) to promote the welfare and education of all minority and immigrant individuals in the Commonwealth of Virginia; and (2) to obtain access to post-secondary education for all individuals, including aliens with undocumented status. According to the complaint, EAE's members include current and former Virginia public high school students and Virginia community college students who are not United States citizens or lawful permanent residents and whose immigration status is, or may be perceived to be, illegal or undocumented. Some EAE members are alleged to be students who graduated from high school in 2003, or who expect to graduate in 2004, and whose exceptional grade point averages and SAT or PSAT scores place them within acceptable academic ranges for admission to the post-secondary educational institutions referred to in the complaint, namely George Mason University (GMU), James Madison University (JMU), Northern Virginia Community College (NVCC), the University of Virginia (UVA), Virginia Commonwealth University (VCU), Virginia Polytechnic Institute and State University (Virginia Tech), and the College of William and Mary (William & Mary). Some EAE members intend to seek admission to these Virginia institutions or to transfer to these institutions from a Virginia community college,

but allegedly will be denied admission, or are currently unable to apply to or attend these institutions, because of policies denying admission to students who are not United States citizens or lawful permanent residents and who are illegal aliens or who may be believed to have an "illegal," "unlawful," or "undocumented" immigration status. Yet other EAE members, it is alleged, have already been denied admission based on their actual or perceived immigration status.

Plaintiff Brian Marroquin is a high school senior who is neither a United States citizen nor a lawful permanent resident, and whose immigration status appears to be illegal. He was brought to this country by his parents as a young child and will now graduate from high school in June 2004, after which he intends to pursue a college education in Virginia. And because his high grade point average and SAT scores fall within acceptable academic ranges to attend GMU, JMU, NVCC, UVA, VCU, Virginia Tech, and William & Mary, he has applied or will apply to these institutions for admission, but believes that, in accordance with the Virginia Attorney General's memorandum, they will deny him admission based on his immigration status. He also alleges he is fearful that, in accordance with the memorandum, college and university officials will report individuals they suspect to have an "illegal," "unlawful," or "undocumented" immigration status to the Virginia Attorney General and the Bureau of Immigration Control and Enforcement (BICE), the successor to the INS. Marroquin is proceeding in this action by his father, Jorge

---

**3.** At the outset of this suit, there were six plaintiffs: one association and five anonymous students who brought suit under various "Doe" pseudonyms. Plaintiffs' motion to proceed by fictitious names, however, was denied and, as a result, the individual plaintiffs were forced to identify themselves. *See Doe v. Merten*, 219 F.R.D. 387 (E.D.Va.2004). Only two individuals chose to do so, and thus they remain named plaintiffs in the case.

Marroquin, as next friend, pursuant to Rule 17, Fed.R.Civ.P.

The second individual plaintiff is Freddy Vasquez, who came to the United States as a minor to be with his parents, who were already here. Like Marroquin, Vasquez is neither a citizen nor a lawful permanent resident of the United States. Unlike Marroquin, however, the record reflects that Vasquez enjoys Temporary Protected Status (TPS) and thus he currently resides in the United States legally.[4] Vasquez graduated from a Virginia public high school in 2003 and has taken the SAT. According to the complaint, Vasquez has an exceptional grade point average and intends to pursue a post-secondary education in Virginia. He falls within acceptable academic ranges to attend GMU and Virginia Tech. He applied to both and was denied admission. He alleges his applications for admission to GMU and Virginia Tech were rejected because of his immigration status. In this respect, Vasquez alleges that he would like to attend GMU or Virginia Tech, but is precluded from doing so because of admissions policies that, upon information and belief, deny admission to students believed to have an "illegal," "unlawful," or "undocumented" immigration status. Vasquez alleges that he will continue to be denied admission as long as GMU and Virginia Tech continue to enforce this admissions policy.

Defendants are the Presidents, Rectors, and Boards of Visitors of GMU, JMU, NVCC, UVA, VCU, Virginia Tech, and William & Mary, who are sued in their official capacities. According to the complaint, these individuals are responsible for establishing and applying "rules and regulations for the acceptance of students" to their respective institutions pursuant to Va.Code § 23–9.6:1. Plaintiffs allege that, in accordance with the Attorney General's memorandum, each of these Virginia post-secondary educational institutions has adopted an admissions policy that denies admission to students who are not United States citizens or lawful permanent residents, and who are illegal aliens or believed to have an "illegal," "unlawful," or "undocumented" immigration status, but are otherwise eligible for admission. Plaintiffs further allege that these institutions have instructed their respective employees to enforce the admissions policies challenged here.

Plaintiffs allege that defendants' admissions policies and the enforcement of those policies denying admission to students based on *actual or perceived* immigration status, coupled with the recommendations of the Virginia Attorney General to report students based on their perceived "illegal," "unlawful," or "undocumented" immigration status, have precluded and/or will preclude Marroquin, members of EAE, and many otherwise qualified persons from applying to and/or attending the defendant institutions. Plaintiffs further allege that other persons, including Vasquez and members of EAE, have applied to these institutions but have been denied admission, and will continue to be denied admission, based on their actual or perceived illegal immigration status. Further, plaintiffs allege that these individuals are subjecting themselves to possible reporting to BICE and the Virginia Attorney General by applying to these institutions.

On the basis of these factual allegations, plaintiffs' complaint consists of three constitutional claims and a request for declaratory and injunctive relief. Count I is

---

**4.** An alien with TPS status is not subject to removal and is authorized to work in the United States. *See* 8 U.S.C. § 1254a.

brought under the Supremacy Clause of the Constitution[5] against all defendants. In this count, plaintiffs allege that, as a result of their admissions policies, defendants (i) are engaging in an impermissible regulation of immigration, (ii) are impermissibly occupying a field over which Congress has exclusive authority, and (iii) have impermissibly implemented a policy that is in conflict with the Constitution and other existing federal law on immigration, in violation of both the Supremacy Clause and the Commerce with Foreign Nations Clause.[6]

Count II is a due process claim brought under 42 U.S.C. § 1983 against all defendants. In this count, plaintiffs allege that the enforcement or threat of enforcement of defendants' admissions policies deprives plaintiffs of their ability to apply to the post-secondary educational institutions referred to in the complaint in violation of the Due Process Clause and that defendants commit this unconstitutional act under color of state law.

Count III seeks declaratory relief pursuant to 28 U.S.C. § 2201 against all defendants regarding the constitutionality and enforceability of defendants' admissions policies. Specifically, Count III seeks a declaratory judgment that defendants' admissions policies violate the Constitution.

By way of other relief, plaintiffs seek permanent injunctive relief enjoining the named defendants from applying and/or continuing to apply admissions policies that deny admission to students who are not United States citizens or lawful permanent residents, and who are illegal aliens

or who are perceived by defendants to have an "illegal," "unlawful," or "undocumented" immigration status.

## II.

### A. Standing

The threshold issue is plaintiffs' standing to assert their claims. Defendants challenge plaintiffs' standing to bring suit pursuant to Rule 12(b)(1), Fed.R.Civ.P. Specifically, they assert (i) that Marroquin does not have standing to challenge defendants' alleged admissions policies because he has not suffered an actual injury and will not suffer any imminent injury; (ii) that Vasquez does not have standing to bring any claims with respect to defendants' alleged policy of denying admission to illegal aliens because he is not an illegal alien; (iii) that Vasquez does not have standing to bring any claims regarding GMU or Virginia Tech's alleged failure to recognize his legal immigration status because he was denied admission to these institutions for reasons unrelated to his immigration status; and (iv) that EAE does not have standing because it has failed to meet its burden of demonstrating that it is a real, functioning "bona fide" organization[7] and has failed to demonstrate that any of its members would have standing to bring suit in their own right.

The doctrine of standing derives from Article III of the Constitution, which precludes federal courts from issuing advisory opinions and instead limits their jurisdiction to trying "cases and controversies." In this way, the doctrine ensures that any given plaintiff is the proper party to bring a matter to federal court for adjudication.

5. U.S. Const., art. VI, cl. 2.

6. U.S. Const., art. I, cl. 3.

7. In this respect, defendants relate that they unsuccessfully sought basic information about

EAE from plaintiffs and that plaintiffs' refusal to provide defendants with such information casts serious doubt on whether EAE is a bona fide organization.

Because the challenge to plaintiffs' standing pursuant to Rule 12(b)(1), Fed. R. Civ. P, concerns "the factual basis for subject matter jurisdiction, the burden of proving subject matter jurisdiction is on the plaintiff." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir.1991). Thus, in determining whether jurisdiction exists, the pleadings' allegations are regarded "as mere evidence on the issue" and evidence outside the pleadings may be considered "without converting the proceeding to one for summary judgment." *Id.* In these circumstances, a "district court should apply the standard applicable to a motion for summary judgment, under which the non-moving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists." *Id.* Thus, it is clear that "[t]he moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.*

■ It is well-settled that "the irreducible constitutional minimum of standing contains three elements. First the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations and quotation marks omitted). "Particularized" means that the injury "must affect the plaintiff in a personal and individual way." *Id.* at 561 n. 1, 112 S.Ct. 2130. Next, "there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly traceable to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.'" *Id.* at

560, 112 S.Ct. 2130. Finally, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* And, from these general principles, it further follows that when a suit challenges the legality of government action or inaction, the nature and extent of facts that must be averred to establish standing "depends considerably upon whether the plaintiff is himself an object of the action (or foregone action) at issue." *Id.* at 561, 112 S.Ct. 2130. In such cases, "there is ordinarily little question that the action or inaction has caused [the plaintiff] injury, and that a judgment preventing or requiring the action will redress it." *Id.* at 561–62, 112 S.Ct. 2130.

■ These principles, applied to Marroquin, point persuasively to the conclusion that he has standing to assert the claims in the complaint. Simply put, Marroquin, as an illegal alien, is "an object of the action ... at issue." *Id.* at 561, 112 S.Ct. 2130. He has submitted applications to GMU, Virginia Tech, JMU, and VCU and intends to apply for admission to NVCC's Fall 2004 class. Clearly, the alleged admissions policies of these institutions, which at this stage in the proceedings must be assumed to exist, will cause Marroquin imminent injury, namely denial of admission on the basis of his illegal immigration status. An injunction preventing the implementation of these policies would redress that injury.

■ Yet this does not end the Marroquin standing analysis, as defendants UVA and William & Mary contend that Marroquin has no standing to challenge their alleged admissions policies because he does not intend to apply to those institutions until next year. In their view, therefore, Marroquin will not suffer any imminent injury from the admissions policies of these institutions. In *Lujan*, the Supreme Court noted that "[a]lthough 'imminence'

is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is 'certainly impending.'" 504 U.S. at 565 n. 2, 112 S.Ct. 2130 (emphasis in original and internal quotation marks omitted). The question, therefore, is whether Marroquin "has made an adequate showing that some time in the relatively near future" he will apply for admission to UVA and William & Mary. See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 211, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) ("We therefore must ask whether Adarand has made an adequate showing that sometime in the relatively near future it will bid on another Government contract that offers financial incentives to a prime contractor for hiring disadvantaged subcontractors.").

In his sworn declaration, Marroquin states that he intended to apply for admission to the Fall 2004 class at UVA, but did not do so because he had not taken the SAT II, which is required by UVA. By the time he discovered that the SAT II is a prerequisite for application to UVA, it was too late for him to take the SAT II and receive the results in time to apply for admission to UVA's Fall 2004 class. In his declaration, however, Marroquin states that he will sit for the SAT II exam this year (2004) and will apply this year, or in January 2005, for admission to UVA for the academic year beginning in 2005. Marroquin also intended to apply for admission to William & Mary's fall of 2004 class, but missed that institution's early application deadline for admission for the academic year commencing in 2004. He intends to apply to William & Mary this year for admission to the class commencing in the Fall of 2005. In sum, Marroquin has concrete plans to apply to both UVA and William & Mary in the near future—this year or by early January

2005, the application deadline for Fall 2005 admission at these institutions.

Supreme Court precedent makes clear that Marroquin's plans to apply to UVA and William & Mary are sufficient to satisfy the imminence requirement for standing. Thus, in Adarand, the Supreme Court held that a plaintiff subcontractor had standing to bring a suit for prospective relief challenging the government's use of subcontractor compensation clauses offering financial incentives to prime contractors for hiring minority subcontractors. 515 U.S. at 212, 115 S.Ct. 2097. There, the Supreme Court concluded that Adarand had standing because there was evidence (i) that Adarand bid on every guardrail project in Colorado; (ii) that Adarand often had to compete for contracts against minority companies; (iii) that the government was likely to let contracts involving guardrail work containing subcontractor compensation clauses at least once per year in Colorado; and (iv) that Adarand was very likely to bid on such contracts. Id. Thus, an intention to bid on a contract that included a subcontractor compensation clause within one year was sufficient to confer standing in Adarand. Similarly, in Rosenfeld v. Montgomery County Public Schools, 41 F.Supp.2d 581 (D.Md.1999), a white plaintiff had standing to challenge the admissions process of a magnet school that allegedly utilized racial preferences because she had concrete plans to apply to the magnet school by a date certain. 41 F.Supp.2d at 585. On these facts, the district court reasoned that because "the date the injury is to occur is neither unspecified nor speculative[,] ... [plaintiff] need not wait until after she has experienced the alleged racial preferencing to file her claim." Id. (internal citation omitted). Similarly, because Marroquin has demonstrated that he has concrete plans to

apply to both UVA and William & Mary in less than a year's time, he has established that the injury he will suffer from the implementation of these institutions' alleged admissions policies is sufficiently imminent. Thus, defendants Rule 12(b)(1) challenge to Marroquin's standing must be denied.

■ Next, defendants challenge Vasquez's standing to bring any claims regarding defendants' alleged policies of denying admission to illegal aliens because he is not, in fact, an illegal alien. In this regard, the record reflects, and plaintiffs concede, that Vasquez enjoys TPS status and thus is not unlawfully present in the United States. It is true that because Vasquez currently resides in the United States legally, he has no standing to challenge admissions policies that only injure those who reside in this country illegally. In their complaint, however, plaintiffs' challenge to defendants' admissions policies is not limited to the denial of admission to illegal aliens; plaintiffs also allege as unconstitutional defendants' policy of denying admission to applicants they, the colleges and universities, *perceive or believe* to have an illegal or undocumented immigration status. Specifically, the complaint alleges that Vasquez would like to attend GMU or Virginia Tech, but is precluded from doing so "because of admissions policies that, upon information and belief, deny admission to students *believed to have* an 'illegal,' 'unlawful,' or 'undocumented' immigration status." (emphasis added). Moreover, plaintiffs further allege that other persons, "including Vasquez and members of EAE," have applied to these institutions "but have been denied, and will continue to be denied, admission based on their *perceived* immigration status." (emphasis added). Thus, the challenged admissions policies injure those individuals *wrongfully* perceived by defendants to be in the United States unlawfully.[8] As someone who holds TPS status, but was nonetheless allegedly denied admission to GMU and Virginia Tech based on his *perceived* illegal immigration status, Vasquez has standing to bring this claim.

Yet, defendants also challenge Vasquez's standing on another ground. They assert that Vasquez lacks standing to bring claims against GMU or Virginia Tech for any alleged misperception of his immigration status because he was denied admission to these institutions for reasons wholly unrelated to his immigration status, perceived or otherwise. In support of this argument, defendants submit the affidavits of Steve Milley, Assistant Director of Admissions at Virginia Tech, and Andrew Flagel, Dean of Admissions at GMU. Milley's affidavit states that Vasquez was denied admission to Virginia Tech's Architecture Program because his GPA and SAT score "were simply not strong enough to secure his admission to that program." Further, Milley states that Vasquez was also denied admission to Virginia Tech's less competitive University Studies Program because "[h]is SAT scores were not competitive in this area either." Therefore, according to Milley, Vasquez's application "was denied for these reasons alone, without regard to his immigration status."

In response, plaintiffs note that Vasquez's GPA of 3.63 is higher than the

---

8. Defendants also argue that plaintiffs should not be allowed to pursue their claim that Virginia institutions are implementing their admissions policies based on perceived unlawful immigration status, which perception may be wrong, because it does not fit within the contours of the complaint. The referenced language in the second amended complaint (along with other similar language) belies this argument. *See Lynn v. West,* 134 F.3d 582, 585 (4th Cir.1998) (on motion to dismiss, court must accept the facts as alleged and draw all reasonable inferences in favor of the nonmoving party).

average GPA of 3.59 for the overall 2002 entering freshman class, according to statistics provided to the public by Virginia Tech.[9] Moreover, Virginia Tech's statistics indicate that ten percent of the Fall 2002 entering class had a verbal SAT score in the same range as Vasquez's, while six percent had a math SAT score in the same range. Of course, this information does not mean that Vasquez should have been admitted to Virginia Tech, but it is enough at this early stage in the proceedings, before discovery has been completed, to create a genuine issue of material fact as to whether Virginia Tech's asserted reasons for denying admission to Vasquez are true. In this respect, it is important to recognize that Vasquez does not have to show that he would have been admitted absent the challenged admissions policies; instead he must show only that the challenged policies precluded him from competing for admission on the merits. This follows from a review of *Adarand* and *Rosenfeld.* The injury in those cases was that "the discriminatory classification prevent[ed] the plaintiff from competing on an equal footing;" therefore, "the aggrieved party need not establish that he would have obtained the benefit but for the barrier in order to establish standing." *Adarand,* 515 U.S. at 211, 115 S.Ct. 2097. While both *Adarand* and *Rosenfeld* involved equal protection claims and the case at bar does not, the cases are nonetheless analogous for standing purposes. Thus, defendants' alleged policies of categorically denying admission to applicants due to their actual or perceived illegal immigration status prevent plaintiffs from even being considered for admission. As a result, Vasquez need not show that if his misperceived illegal immigration status had not been the determinative factor in Virginia Tech's decision to deny him admission, he would have been granted admission to Virginia Tech. Vasquez's injury is simply that his applications will not be considered on the merits by defendants owing to defendants' misperception of his immigration status. Therefore, at least for the time being, Vasquez has standing to challenge Virginia Tech's denial of his admission based on his misperceived illegal immigration status.[10]

■ With respect to GMU, Flagel's affidavit states that Vasquez was denied admission to the Fall 2003 class because his transcripts were not received until May 12, 2003—after the date the Fall 2003 freshman class was closed. In response, plaintiffs submit Vasquez's declaration, in which he states that Vivian Hunt, his high school transcript clerk, assured him in February 2003 that she had already sent a copy of his transcript to GMU.[11] Following this, Hunt made another copy of his transcript, placed it in a sealed envelope addressed to GMU's admissions office along with other documents, and asked Vasquez to put the envelope in the mailbox, which Vasquez immediately did. Plaintiffs also submit a document purportedly from Vasquez's high school showing that the transcript clerk sent Vasquez's transcript to GMU on February 12, 2003. Finally, plaintiffs also adduce evidence of public statements made by George Walsch, the Director of University Relations at GMU, confirming that the

9. *See* Exhibit 7, attached to plaintiffs' Supplemental Memorandum in Opposition to Defendants' Motion to Dismiss.

10. It is important to note that a motion pursuant to Rule 12(b)(1), Fed.R.Civ.P., can be brought at any time and hence plaintiffs' standing may be challenged again on summary judgment. *See* Rule 12(h)(3), Fed. R.Civ.P.

11. Vasquez went to see Hunt after receiving a letter from GMU dated February 7, 2003 informing him that his application was incomplete because the university did not have a copy of his transcript.

university "has followed [Virginia Attorney General] Kilgore's lead on not admitting undocumented citizens ...." Anthony Lamesa, *U. Virginia, 6 Other Virginia Colleges Sued,* Cavalier Daily via U–Wire, Sept. 5, 2003, *available at* 2003 WL 59920354. As a result, a genuine dispute exits as to whether Vasquez's transcript was received before or after the deadline and thus whether GMU's proffered reason for denying admission to Vasquez is true. Therefore, defendants' motion to dismiss Vasquez for lack of standing must be denied at this time.

■ Defendants' also challenge EAE's standing to challenge their admissions policies. In this respect, they argue that EAE has failed to demonstrate that it is a real, functioning, bona fide organization. In response, plaintiffs submit the declaration of Robert R. Garcia, a member of EAE's Executive Committee and Treasurer of the organization. In his declaration, Garcia states that EAE was formed in March 2003 as an unincorporated association by a group of Northern Virginia high school students, teachers, and citizens who were concerned about the increasing barriers to post-secondary educational opportunities for Virginia high school students, particularly legal and illegal immigrant students who have lived and studied in Virginia public schools for years. Garcia further states that the group was formed to address issues, such as (i) the Virginia Attorney General's memorandum urging public post-secondary institutions to deny admission to illegal aliens, (ii) then-pending legislation before the Virginia General Assembly denying post-secondary admission to illegal aliens and prohibiting Virginia from providing in-state tuition to such persons, and (iii) the pending federal legislation that would make is easier for states, including Virginia, to provide in-state tu-

ition to all Virginia residents regardless of their immigration status.

According to Garcia, EAE's objectives, as stated in the organization's bylaws attached to his declaration, are "to promote the welfare and education of all minority and immigrant individuals in the Commonwealth of Virginia," including "those with undocumented status" by ensuring that these individuals have "access to post-secondary education ...." Garcia further declares that after EAE was formed, the organization took action on issues related to its mission. For example, after the Virginia General Assembly voted to enact legislation that would deny in-state tuition to undocumented students, EAE sent a letter to Virginia governor Mark Warner urging him to veto the bill. This letter, dated April 9, 2003, and signed by "Robert R. Garcia For the Executive Committee Equal Access Education Association", is attached to Garcia's declaration. Governor Warner did veto the bill, and wrote a response to EAE with a copy of his veto message. This letter, dated May 12, 2003, is also attached to Garcia's declaration.

Garcia notes that EAE also acted to further its mission by joining this lawsuit. Moreover, he states that future EAE activities include plans for continued involvement in advocacy for pending federal legislation and continued monitoring of state legislation on access to post-secondary education. Garcia also states that EAE has a membership roster; the organization had 13 members at the time it was founded and currently has 14 members. It also appears that EAE has had four regular meetings since its founding and some EAE members have met informally to follow up on issues related to EAE. Finally, Garcia declares that "[s]everal of EAE's members are themselves undocumented immigrants who reside in Virginia and who are interested in attending the public colleges and

universities named as defendants in this lawsuit."

The principles that govern associational standing are well established. In *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Supreme Court held that

> [A]n association has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted or the relief requested requires the participation of individual members in the lawsuit.

432 U.S. at 343, 97 S.Ct. 2434. The facts set forth in Garcia's declaration and attached documents not only demonstrate that EAE is a real, functioning organization, but also establish that EAE meets the *Hunt* test for associational standing. Thus, the declaration states that EAE has members who are undocumented immigrants who reside in Virginia and who are interested in attending the defendant institutions. These individuals, therefore, are directly affected by defendants' alleged admissions policies and would thus have standing to sue in their own right, thus satisfying *Hunt*'s first prong.[12] EAE's mission, as stated in its by-laws, is "[t]o promote the welfare and education of all minority and immigrant individuals in the Commonwealth of Virginia" and to "obtain

access to post-secondary education for all individuals, including those with undocumented status." Certainly the interests EAE seeks to protect through this lawsuit are germane to the organization's purpose, thus satisfying *Hunt*'s second prong. Finally, neither the claims asserted, nor the relief requested, require the participation of individual members in the lawsuit as plaintiffs seek injunctive and declaratory relief, not monetary damages. The key inquiry under prong (3) is whether the relief sought is based on individualized damages or prospective relief. As the Supreme Court put it in *Warth v. Seldin*,

> [W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind.

422 U.S. 490, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Given this, it appears that EAE meets the *Hunt* and *Warth* tests for associational standing at this time and defendants' motion to dismiss EAE for lack of standing must be denied.[13]

---

**12.** In addition, at the hearing on this matter, counsel for plaintiffs indicated that both Marroquin and Vasquez are members of EAE. As already discussed, these individuals have standing to challenge defendants' alleged policies, therefore their membership in EAE confirms that EAE satisfies *Hunt*'s first prong.

**13.** Defendants are correct in pointing out that they have not had an opportunity to take discovery to assess and/or challenge the asser-

tions made by Garcia in his declaration, but it is improper to dismiss EAE for lack of standing on this basis on a Rule 12(b)(1) motion. Under Rule 12(b)(1), "[t]he moving party should prevail only if the material jurisdictional facts *are not in dispute* and the moving party is entitled to prevail as a matter of law." *Richmond*, 945 F.2d at 768. At this time, the jurisdictional facts apparently are in dispute, and thus dismissal is not warranted. Defendants, however, can bring a 12(b)(1) motion

## B. Supremacy Clause Preemption

Defendants move to dismiss plaintiffs' Supremacy Clause claim pursuant to Rule 12(b)(6), Fed.R.Civ.P., arguing that their alleged admissions policies do not offend the Supremacy Clause of the Constitution because defendants' admissions policies do not constitute a regulation of immigration and therefore are not federally pre-empted.

■■■■ The Supremacy Clause provides that the Constitution, and laws and treaties made pursuant to it, are the supreme law of the land. U.S. Const., art. VI, cl. 2. Under this clause, "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to a federal law, must yield." *Gade v. Nat'l Solid Wastes Management Assoc.*, 505 U.S. 88, 108, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (internal quotation marks omitted). In assessing a Supremacy Clause challenge, therefore, courts must determine whether a particular state law or action is pre-empted by the Constitution itself or by a federal statute or regulation.

■■■■ Federal authority to regulate immigration "derives from various sources, including the federal government's power '[t]o establish [a] uniform Rule of Naturalization,' U.S. Const. art. I, § 8, cl. 4, its power '[t]o regulate commerce with foreign Nations,' *id.*, cl. 3, and its broad authority over foreign affairs." *Toll v. Moreno*, 458 U.S. 1, 10, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982). Thus, there is no doubt that the "[p]ower to regulate immigration is unquestionably exclusively a federal power."

*De Canas v. Bica*, 424 U.S. 351, 354, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976). Yet, not every state enactment or action "which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power, whether latent or exercised." *Id.* at 355, 96 S.Ct. 933. As Justice Brennan put it, "standing alone, the fact that aliens are the subject of a state statute does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *Id.*

The Supreme Court's decision in *De Canas* is particularly instructive here. There, the Supreme Court held that a California statute prohibiting employers from knowingly employing aliens not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers was not pre-empted by federal law. *Id.* at 353, 96 S.Ct. 933. In its analysis, the Supreme Court set forth a three-part test for determining whether an immigration-related state statute, action, or policy is pre-empted by federal law.[14] The first test under *De Canas* asks whether the state enactment or policy is an attempt to regulate immigration. *Id.* at 355, 96 S.Ct. 933. Under the second test, even if the state statute is not an impermissible regulation of immigration, it may still be pre-empted if there is a showing that it was the "clear and manifest purpose of Congress" to effect a "complete ouster of state

at any time. *See* Rule 12(h)(3), Fed.R.Civ.P. ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

14. While there is no state *statute* at issue in this case, the parties do not dispute that a state *policy* related to immigration is subject to the same analysis as a statute. *See, e.g., Gonzales v. City of Peoria*, 722 F.2d 468 (9th Cir.1983), *overruled on other grounds by Hodgers–Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir.1999), (analyzing city police policy of arresting aliens for violations of immigration law under *De Canas* framework).

power—including state power to promulgate laws not in conflict with federal laws" with respect to the subject matter the state attempts to regulate. *Id.* at 357, 96 S.Ct. 933. In other words, a state statute is pre-empted where Congress intended to "occupy the field" the state policy or statute attempts to regulate. Finally, under the third test, a state law is pre-empted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *id.* at 363, 96 S.Ct. 933, or if it conflicts with federal law, making compliance with both state and federal law impossible. *Michigan Canners & Freezers v. Agricultural Marketing & Bargaining Bd.,* 467 U.S. 461, 469, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984).

■ Plaintiffs argue that defendants' admissions policies fail the first *De Canas* test because defendants are requiring their admissions officers to: (i) make independent determinations on an applicant's immigration status by applying state-created or school-created criteria for verifying or classifying their immigration status or perceived immigration status; (ii) notify the applicant of the institution's determination; and in some circumstances (iii) report the immigration determination to the Office of the Virginia Attorney General and/or federal immigration authorities.

*De Canas* itself provides the key to the analysis of plaintiffs' argument. There, the Supreme Court found that the California statute at issue was not a regulation of immigration because it did not amount to a state "determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *Id.* Instead, the Supreme Court found that California had "sought to strengthen its economy *by adopting federal standards* in imposing criminal sanctions against state employers who knowingly employ aliens who have no

federal right to employment within the country." *Id.* (emphasis added). The Supreme Court further noted that "even if such local regulation has some purely speculative and indirect impact on immigration, it does not thereby become a constitutionally proscribed regulation of immigration . . . ." *Id.* at 355–56, 96 S.Ct. 933.

Essential to the *De Canas* decision is the fact that the California statute adopted *federal standards,* thus saving it from becoming "a constitutionally proscribed regulation of immigration that Congress itself would be powerless to authorize or approve." 424 U.S. at 356, 96 S.Ct. 933. The importance of this distinction is clear because the Constitution itself prohibits Congress from authorizing or approving a scheme under which states create their own standards to assess an alien's immigration status, as the formulation of such a standard amounts to "essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *Id.* The national government has broad and exclusive "constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization." *Graham v. Richardson,* 403 U.S. 365, 377, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (internal quotation marks omitted); *see also Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 419, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948); *Hines v. Davidowitz,* 312 U.S. 52, 66, 61 S.Ct. 399, 85 L.Ed. 581 (1941). As such, Congress may not constitutionally authorize states to set their own standards to determine who is and is not an illegal alien. In other words, it is the creation of standards for determining who is and is not in this country legally that constitutes a regulation of immigration in these cir-

cumstances, not whether a state's determination in this regard results in the actual removal or inadmissibility of any particular alien, for the standards themselves are "a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *De Canas,* 424 U.S. at 355, 96 S.Ct. 933. In short, formulating a legal immigration standard is a regulation of immigration that states cannot make, as this power belongs exclusively to the federal government. *See Plyler v. Doe,* 457 U.S. 202, 225, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) ("The States enjoy no power with respect to the classification of aliens. This power is committed to the political branches of the Federal Government." (internal citations and quotation marks omitted)).[15]

■ As to the first *De Canas* test, then, it is clear from the teaching of that case that there is no Supremacy Clause bar to a state admissions policy that denies admission to illegal aliens, provided that in doing so, the institutions implementing the policy adopt federal immigration stan-dards. This case turns, therefore, on whether defendants' admissions policies simply adopt federal standards, in which case they are not invalid under the Supremacy Clause, or instead create and apply state standards to assess the immigration status of applicants, in which case the policies may run afoul of the Supremacy Clause.

Plaintiffs allege that defendants have created their own standards. If they ultimately can show that defendants have failed to adopt federal immigration standards in implementing their policies of denying admission to illegal aliens, and instead have either implicitly or explicitly developed their own, different standards, then defendants' alleged policies would amount to a regulation of immigration under the first *De Canas* test. *See League of United Latin American Citizens v. Wilson,* 908 F.Supp. 755, 769–70 (C.D.Cal. 1995) ("*LULAC I*") ("[C]ertain of Proposition 187's provisions require state agents to make *independent* ·determinations of who is subject to the initiative's benefits denial, notification and cooperation/report-

---

**15.** The formulation of a state standard that classifies certain aliens as illegal when the federal standard does not and then denies some benefit to these misclassified aliens also undermines federal immigration policy concerning who is legally permitted to reside in this country. This is clear from a review of relevant Supreme Court precedent rejecting, for example, state laws restricting fishing rights of aliens denied naturalization in *Takahashi,* 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478, and length of residency requirements for aliens seeking welfare in *Graham,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534, because of a perceived conflict between the burdensome state regulation and the decision by federal authorities to grant residency privileges to the affected aliens. It is clear that states "can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization, and residence of aliens in the United States or the several states." *Takahashi,* 334 U.S. at 419, 68 S.Ct. 1138. Thus, "[s]tate laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with th[e] constitutionally derived federal power to regulate immigration and have accordingly been held invalid." *Id.* As a result, a state policy denying public post-secondary education to aliens lawfully residing in the United States would likely impose a discriminatory burden upon the residence of such lawful aliens. A state policy that first classifies aliens as illegal when they are in fact legally present under federal law and then, based on this classification, denies them public post-secondary education has the same practical effect (although in two steps instead of one) and thus poses the same constitutional problem. The state laws at issue in *Takahashi* and *Graham* were found to interfere with the federal government's regulation of immigration despite the fact that, as here, neither law resulted in the removal or inadmissibility of any aliens.

ing provisions and who may lawfully remain in the United States ... Proposition 187's classification provisions create an entirely *independent* set of criteria by which to classify individuals based on immigration status." (emphasis in original)).

The second *De Canas* test asks whether the state is attempting to regulate a field that is completely occupied by the federal government for "[e]ven when the Constitution does not itself commit exclusive power to regulate a particular field to the Federal government, there are situations in which state regulation, although harmonious with federal regulation, must nevertheless be invalidated under the Supremacy Clause." 424 U.S. at 356, 96 S.Ct. 933. In this respect, however, it is clear that

> federal regulation ... should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.

*Florida Lime & Avocado Growers v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963).

█ Plaintiffs argue that defendants have impermissibly invaded two fields occupied completely by the federal government: (i) the field of immigration regulation, specifically in the area of classification and reporting of persons based on immigration status as governed by the Immigration and Nationality Act (INA),[16] and (ii) the field of alien access to post-secondary education. With respect to the first field, plaintiffs argue that through the INA, Congress has delegated to immigration judges and the Department of Homeland Security the exclusive power to make independent determinations of immigration status, precluding all others, including state educators, from doing so. To support their argument, plaintiffs rely on 8 U.S.C. § 1252(b) and 8 C.F.R. § 100.2(c)(2). These federal laws and regulations, however, do not support plaintiffs' contention. Section 1252(b) of Title 8 merely sets forth the requirements for judicial review of removal orders, while 8 C.F.R. § 100.2(c)(2) states that the Office of Enforcement "is responsible for the planning, oversight, and advancement of enforcement programs engaged in interpretation of the immigration and nationality laws, and the development of Service policies to assist enforcement activities." This regulation merely outlines the responsibilities of the Office of Enforcement; it does not preclude state institutions from using federal standards to deny admission to illegal aliens.

█ With respect to the field of alien access to post-secondary education, plaintiffs point to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA).[17] PRWORA classifies persons as qualified or non-qualified aliens for the purpose of determining eligibility for federal, state and local benefits, including post-secondary tuition assistance benefits. 8 U.S.C. § 1601 *et seq.* Plaintiffs argue that because under 8 U.S.C. § 1642, the PRWORA sets forth a system for verifying eligibility, including immigration status, for federal public benefits, Congress has created a comprehensive regulatory scheme that classifies persons based on immigration status and verifies their status, thereby completely occupying this field.

---

**16.** 66 Stat. 163, as amended, 8 U.S.C. § 1101 *et seq.*

**17.** Pub.L. No. 104–193, 110 Stat. 2105 (1996).

As defendants note, however, the scheme PRWORA creates pertains to benefits not at issue here. In the area of post-secondary education, PRWORA addresses only post-secondary monetary assistance paid to students or their households, not admissions to college or university. *See* 8 U.S.C. § 1611. More specifically, PRWORA denies post-secondary monetary assistance to illegal aliens; and any state wishing to make an illegal alien eligible for any state or local public benefit for which the alien would otherwise be ineligible under PRWORA must enact a state law affirmatively providing for such eligibility. *See* 8 U.S.C. § 1621(d).[18] As a result, it does appear that Congress has pre-empted the field of determining alien eligibility for certain public benefits, including even state benefits. This does not mean, however, that states cannot adopt federal standards governing an alien's status in the United States to prevent illegal aliens from attending public post-secondary educational institutions. Simply put, access to public higher education is not a benefit governed by PRWORA, nor is it a field completely occupied by the federal government.

Again, *De Canas* is instructive and confirms this conclusion. There, the Supreme Court refused to presume that Congress' passage of the INA demonstrated "a clear and manifest purpose" to preclude states from promulgating non-conflicting state laws. 424 U.S. at 358, 96 S.Ct. 933. Significantly, the INA was deemed insufficient in scope to invalidate California's law governing employment of illegal aliens, notwithstanding that Act's comprehensive scheme governing all aspects of immigration, including employment of aliens. *Id.* at 361–62, 96 S.Ct. 933. This is an *a fortiori* case for no preemption given that PRWORA does not govern college admissions for illegal aliens.[19] As a result, not only has Congress failed to occupy completely the field of illegal alien eligibility for public post-secondary education, it has failed to legislate in this field at all and thus has not occupied any part of it, completely or otherwise.[20]

■ Plaintiffs also argue that Congress has completely occupied the field of alien's access to post-secondary education through legislation establishing the criteria that aliens seeking to travel to the United States to pursue a post-secondary education must comply with in order to attend any college or university in the United States. Specifically, Congress has created

18. It is clear, therefore, that PRWORA does not consider mere admission or attendance at a public post-secondary institution to be a public benefit. Otherwise, Virginia would be *required* to deny admission to illegal aliens, unless the state affirmatively enacted a law allowing for their admission into public colleges and universities.

19. *But see League of United Latin American Citizens v. Wilson*, 997 F.Supp. 1244, 1256 (C.D.Cal.1997) (*"LULAC II"*) (holding that, pursuant to PRWORA and IIRIRA, Congress had evinced its intention to occupy the field of "alien eligibility for post-secondary education" and invalidating on federal preemption grounds section 8 of California's Proposition 187, which denied public post-secondary education to immigrants not lawfully present). *LULAC II* is neither controlling nor persuasive with respect to PRWORA's preclusive effect on state regulation of illegal alien access to public post-secondary educational institutions.

20. This does not alter the fact, however, that if officials at a state university are classifying aliens as "undocumented" or "illegal" in a manner different from the federal government, a Supremacy Clause problem is thus presented because the federal government, through the INA, has certainly occupied the field of formulating the governing definitions and standards for determining a person's immigration status.

a category of "student visas" and has defined eligibility criteria for such visas. *See, e.g.,* 8 U.S.C. § 1101(a)(15)(F).[21] Congress has also created the Student and Exchange Visitor Information System (SEVIS) to monitor student visa holders while they are in the United States. 8 U.S.C. § 1372. The student visa program and its audit system, SEVIS, do not mandate admission of illegal aliens to universities. Instead, these laws require all schools who accept foreign nationals to monitor the status and progress of foreign nationals holding student visas. The federal government's creation of a student visa category does not completely occupy the field of alien access to post-secondary educational institutions in the United States, although it certainly constitutes legislation in this field. Simply put, Congress, by creating a category of student visas, has not demonstrated "a clear and manifest purpose" to oust completely state power to promulgate non-conflicting state laws. *De Canas,* 424 U.S. at 358, 96 S.Ct. 933. Moreover, nothing in defendants' challenged admissions policies conflicts with federal eligibility criteria for student visas. To the contrary, defendants' alleged admissions policies complement the student visa program by denying admission to aliens who are ineligible to receive student visas and do not reside legally in the United States. It defies logic to conclude that by enacting federal requirements for non-immigrant foreign nationals to come to the United States to pursue a course of study, Congress left states powerless to deny admission to illegal aliens—a category that undoubtedly includes some individuals who bypassed the student visa

system by entering and residing in this country unlawfully. At the very least, Congress has not demonstrated a "a clear and manifest purpose" to do so. Therefore, the federal student visa program and SEVIS do not pre-empt defendants' alleged admissions policies.

▮ Finally, plaintiffs note that the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA)[22] provides that a public post-secondary educational institution may not grant in-state tuition benefits to illegal aliens unless such an institution also grants in-state tuition to out-of-state United States citizens. *See* 8 U.S.C. § 1623(a). Plaintiffs thus argue that because it is only possible to discuss in-state tuition if a student has already been admitted to a public college or university, Congress has implicitly recognized that illegal aliens might be attending public post-secondary institutions and has not acted to prohibit them from doing so. While § 1623 may reflect that Congress is aware that illegal aliens may be attending some public colleges and universities, that section by no means warrants the conclusion that Congress has occupied the field of alien access to post-secondary educational institutions and thus defendants may not deny admission to illegal aliens. The more persuasive inference to draw from § 1623 is that public post-secondary institutions need not admit illegal aliens at all, but if they do, these aliens cannot receive in-state tuition unless out-of-state United States citizens receive this benefit. In other words, recognition that some public institutions admit illegal aliens does not mean that Congress, by failing to act to

---

**21.** To be eligible for a student visa, an alien must (i) have "a residence in a foreign country which he has no intention of abandoning;" and (ii) be "a bona fide student qualified to pursue a full course of study ... who seeks to enter the United States temporarily and solely

for the purpose of pursuing such a course of study consistent with section 1184(1) of this title." 8 U.S.C. § 1101(a)(15)(F).

**22.** Pub.L. No. 104–208, 110 Stat. 3009–546 (1996).

stop this, has precluded other public institutions from denying admission to such aliens. Congress' failure to act in this regard has not ousted states' authority to regulate in this area; instead, it is clear that Congress has left the states to decide for themselves whether or not to admit illegal aliens into their public post-secondary institutions.

In sum, therefore, none of the federal statutes cited by plaintiffs—alone or taken together—demonstrate a clear and manifest purpose on the part of Congress to oust non-conflicting state laws or policies in the area of alien access to post-secondary education. As a result, plaintiffs have not shown that defendants' alleged admissions policies violate the second *De Canas* test.

 Finally, plaintiffs assert under the third *De Canas* test that defendants' alleged admissions policies conflict with existing federal law and are thus pre-empted. Even when Congress has neither expressly pre-empted state law nor "occupied the field," a state law is *per se* pre-empted if it burdens or conflicts with federal law. *Cox v. Shalala*, 112 F.3d 151, 154 (4th Cir. 1997). A conflict exists "when it is impossible to comply with both state and federal law, or if the state law is an obstacle to the accomplishment of the full purposes and objectives of Congress in enacting the federal legislation." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988) (internal quotation marks and citations omitted). Plaintiffs contend that defendants' policies conflict with the classification and reporting schemes found in the INA, PRWORA, and IIRIRA. More specifically, plaintiffs argue that defendants have created a separate regulatory scheme to classify and report the immigration status or perceived immigration status of students.

 The scheme at issue in PRWORA deals specifically with verification procedures for determining whether an alien applying for a federal, state, or local public benefit is a "qualified alien" eligible for the public benefits referred to in the statute. 8 U.S.C. § 1642(a). As noted earlier, admission to public post-secondary educational institutions is not a public benefit under PRWORA. Therefore, any regulatory scheme authorized by PRWORA by its terms is irrelevant to a determination of whether an alien is eligible for a benefit not governed by PRWORA—in this case, admission to a public post-secondary educational institution. As a result, defendants' alleged admissions policies do not conflict with PRWORA's classification, verification, or reporting schemes.

 The same is true for IIRIRA, which regulates, *inter alia*, alien eligibility for post-secondary education benefits on the basis of residence within a state. *See* 8 U.S.C. § 1623(a). As discussed earlier, IIRIRA says nothing about admission of illegal aliens to post-secondary educational institutions; admission is not one of the benefits IIRIRA regulates. As a result, any classification or reporting scheme referred to in IIRIRA has no bearing on whether a public post-secondary educational institution may deny admission to illegal aliens. Therefore, the alleged admissions policies are not in conflict with these federal statutory schemes; it is possible for defendants to comply with both PRWORA and IIRIRA and, at the same time, enforce their alleged admissions policies. Nor are defendants' alleged policies an obstacle to the full purposes and objectives of Congress in enacting PWRORA and IIRIRA. Indeed, in enacting PWRORA and IIRIRA, Congress made clear statements of national policy concerning welfare and immigration, affirmatively stating that there is a "compelling govern-

ment interest to remove the incentive for illegal immigration provided by the availability of public benefits." 8 U.S.C. § 1601. It is clear that denying illegal aliens admission to public·colleges and universities simply removes another public incentive for illegal immigration; .it certainly does nothing to promote illegal immigration and therefore does not create an obstacle to the purpose and objective of PWRORA or IIRIRA.

Plaintiffs correctly note, however, that a policy that classifies Vasquez as an illegal alien, although he has TPS status and is lawfully present in the United States under federal law, directly conflicts with federal laws defining categories of persons lawfully or unlawfully present in the United States. Therefore, if plaintiffs are able to demonstrate at summary judgment or at trial that defendants are using standards different from those established under federal law to determine an applicant's immigration status, this state classification would not only amount to a regulation of immigration under the first *De Canas* test, but it would also be a classification system in conflict with federal immigration laws defining the various immigration statuses an alien may possess. Such a conflict with the federal classification scheme under the INA would lead to federal preemption under the third *De Canas* test.

Finally, plaintiffs argue that because Congress has not precluded the admission of illegal aliens to post-secondary educational institutions, defendants' alleged policies burden Congress' ability to legislate on this issue and thus run afoul of the third *De Canas* test. This argument is unpersuasive, for there is plainly no conflict with federal law when Congress has not acted. If, in the future, Congress enacts legislation on this issue, only then might a conflict potentially arise. Congressional silence on an issue is insufficient to create a conflict with state law. Put simply, defendants' alleged admissions policies cannot conflict with a federal law that does not exist.

In summary, *De Canas* makes clear that the Supremacy Clause does not bar defendants from adopting and enforcing admissions policies that deny admission to illegal aliens, provided that defendants use federal immigration status standards to identify which applicants are illegal aliens. But plaintiffs allege not just that defendants deny admission to illegal aliens, but also that in implementing the alleged admissions policies, defendants are using standards different from federal standards to classify aliens as legal or illegal. If plaintiffs can adduce facts to prove this allegation, they may establish a conflict with federal law and hence a Supremacy Clause bar. Thus, dismissal on this issue is not warranted at this point in the litigation. Resolution of this issue must await a more fully developed factual record at summary judgment or trial. But it is clear that defendants.are not federally pre-empted under any of the *De Canas* tests from using federal immigration standards to deny admission to illegal aliens; such a policy does not violate the Supremacy Clause. Thus, to the extent the complaint claims otherwise, it. is properly subject to threshold dismissal.

## C. Foreign Commerce Clause

Plaintiffs argue ·that defendants' alleged admissions policies violate the Foreign Commerce Clause of the Constitution because the policies both discriminate against, and excessively interfere with, foreign commerce. Specifically, plaintiffs contend that defendants' policies impermissibly affect foreign commerce by relegating illegal aliens to low-income employment, thereby limiting and re-

stricting international remittance payments made by illegal aliens to their home countries.[23] Distilled to its essence, plaintiffs' argument is that by categorically denying admission to all illegal aliens, defendants effectively prevent such aliens from receiving the higher income that typically accompanies a college education, thus limiting the dollar amount of international remittance payments, which payments in turn constitute a transaction in foreign commerce. Plaintiffs' argument, therefore, amounts to a dormant foreign commerce clause argument.[24]

■■■■ The dormant commerce clause is the principle, inferred from the grant of power to Congress in Article I, § 8 of the Constitution to regulate commerce among the states and with foreign nations, that state and local laws are unconstitutional if they place an undue burden on interstate or foreign commerce. The first step in the analysis of whether a state law or regulation violates the dormant commerce clause is to determine whether it discriminates against foreign or interstate commerce. In the words of Justice Brennan, the proper inquiry in this regard is "whether the challenged statute regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect." *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). There exists a strong presumption against discriminatory laws that burden interstate or foreign commerce. A discriminatory law will be upheld only if it is proven that the law is necessary to achieve a legitimate government purpose. *Id.* at 337, 99 S.Ct. 1727 ("[S]uch facial discrimination invokes the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives."). A different test applies, however, when a state law or regulation does not discriminate against interstate or foreign commerce, and its effects on such commerce are only incidental.[25] In these circumstances, the state law "will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) (enunciating this test in interstate commerce context); *see also Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 66 (1st Cir.1999) (noting availability of *Pike* test in foreign commerce clause context). In short, because the tests applied in each situation differ so significantly, the determination of whether a state law or policy discriminates against foreign or interstate commerce can prove decisive to the ultimate question of whether the dormant commerce clause is violated.

It is clear that defendants' alleged admissions policies are by no stretch of the imagination a regulation of foreign com-

---

**23.** Remittances are "the portion of international migrant workers' earnings sent back to countries of origin." Multilateral Investment Fund, Inter–American Development Bank, *Remittances to Latin America and the Carribean* 1 (Feb.2002) (attached as Exhibit K to Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss).

**24.** The dormant commerce clause principle is also sometimes referred to as the negative implications of the commerce clause. *See, e.g., Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 154, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) ("A state tax may violate the 'negative implications' of the Insterstate Commerce Clause by unduly burdening or discriminating against interstate commerce.").

**25.** For a thorough discussion of the two different tests used in dormant commerce clause jurisprudence, see Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 317–33 (1997).

merce and furthermore do not discriminate against foreign commerce. Indeed foreign commerce is only implicated through the tenuous route of international remittance payments described above. There is no doubt that the purpose of defendants' alleged policies is not to lower international remittance payments; any effect defendants' policies have on these payments is purely incidental. Therefore, defendants' policies must be upheld unless the burden imposed by them on foreign commerce "is clearly excessive in relation to the putative local benefits." *Pike,* 397 U.S. at 142, 90 S.Ct. 844.

Plaintiffs argue that remittance payments from illegal aliens have a significant impact on foreign commerce in that they constitute an important source of income for recipient nations and, in the case of some nations, equal or exceed foreign direct investment and incomes from major industries such as oil and tourism in many countries in Latin America and the Caribbean.[26] They also note that "[i]t is a tautology that education levels determine job opportunities and income," and argue that defendants' policies permanently confine illegal aliens to low-income jobs.

Plaintiffs' argument must fail for several reasons. First, the complaint is completely devoid of any allegations that any plaintiffs make or intend to make remittance payments. More importantly, even assuming that international remittance payments constitute foreign commerce and are an important source of income for recipient nations, plaintiffs must still demonstrate that defendants' admissions policies are a major cause of lower remittance payments and that lower remittance payments from illegal aliens *in Virginia* have more than a minimal impact on foreign commerce. Even if illegal aliens are permitted to pur-

sue higher education in Virginia, so long as they remain illegal aliens, they are ineligible for employment in the United States under federal law. While it is axiomatic that higher education generally brings higher salaries, this is not the case for individuals who are not authorized to work in the United States and who therefore are severely limited in their job options, with or without a college degree. It is more than likely, therefore, that this ineligibility for lawful employment is what relegates illegal aliens to unskilled, low-paying, "under the table" jobs, not their lack of a post-secondary education. Moreover, even if defendants were to admit illegal aliens, they need not grant them in-state tuition, which effectively may prevent the vast majority of illegal aliens from pursuing higher education in Virginia. Because in-state tuition is not a viable option under federal law, there is little financial incentive for plaintiffs, or those like them, to choose a public post-secondary institution in Virginia over a public institution elsewhere, or even a private institution in Virginia that does not have a policy of denying admission to illegal aliens. As a result, defendants' policies do not relegate all illegal aliens residing in Virginia to at most a high school education. Because there are universities that do not use immigration status as a determinative factor in admissions, Virginia's illegal aliens *can* pursue higher education; they simply cannot do so at the six defendant institutions.

Furthermore, general evidence on the importance of remittance payments to foreign commerce is insufficient. Remittance payments to home countries are made by all sorts of aliens, not simply those who reside in this country unlawfully. In order for defendants' policies to burden foreign commerce, there must first be a showing

---

**26.** Plaintiffs contend that they will submit expert testimony on the magnitude of remit-

tance payments and their importance to foreign commerce.

that a significant percentage of remittance payments are made by illegal aliens who not only reside in Virginia, but also who have the qualifications and desire to pursue higher education.[27] The link between defendants' admissions policies and any effect on foreign commerce is simply too tenuous, and certainly does not outweigh the local benefit of conserving state educational resources for United States citizens and foreign nationals legally present in this country. As a result, plaintiffs' foreign commerce clause claim must be dismissed.

## D. Due Process

▮▮▮▮ Finally, plaintiffs contend that defendants' alleged admissions policies violate the Due Process Clause of the Fourteenth Amendment. There is no doubt that all persons, including those in this country unlawfully, are protected by the Due Process Clause of the Fifth and Fourteenth Amendments. *See Zadvydas v. Davis,* 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) ("Once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."). To establish a due process violation, "a plaintiff must first show that he has a constitutionally protected 'liberty' or 'property' interest, and that he has been 'deprived' of that protected interest by some form of 'state action.'" *Stone v. Univ. of Md. Med. Sys. Corp.,* 855 F.2d 167, 172 (4th Cir.1988).

▮▮▮ Plaintiffs argue that defendants' policies of denying admission to individuals they perceive to be illegal aliens deprives plaintiffs of two property interests: (1) a

property interest in receiving a public education at Virginia community colleges, such as NVCC, that have adopted open enrollment admissions policies; and (2) a property interest in receiving a fair and impartial admissions decision based on a review of their applications and constitutionally permissible admissions criteria. One part of this second asserted property interest can be dealt with quickly at the outset, for it depends on a determination that defendants' consideration of an applicant's illegal immigration status is constitutionally impermissible because such a policy violates the Supremacy Clause. As already discussed, the opposite conclusion has been reached in this case: A state university does not violate the Supremacy Clause by denying admission to illegal aliens, so long as federal immigration standards are used to identify applicants who fall into this category. As a result, illegal immigration status is not a constitutionally impermissible criterion on which to base an admissions decision and plaintiffs have no property interest in an admissions decision that does not take illegal immigration status into account.

▮▮▮▮ It is well settled that to have a property interest in a benefit, a plaintiff must have more than an abstract need or desire for, or a unilateral expectation of it. *Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). A plaintiff "must, instead, have a legitimate claim of entitlement to it" for "[i]t is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." *Id.* As the Supreme Court explained in *Roth,* property rights

---

**27.** It is also important to note that individuals like plaintiffs, who came to this country as young children with their parents, are partic-

ularly unlikely to make remittance payments because their immediate family currently resides in the United States.

are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* Thus, a determination of whether plaintiffs have a property interest protected by the Fourteenth Amendment must be made by "look[ing] for an independent source of a 'claim of entitlement.'" *Mallette v. Arlington County Employees' Supplemental Retirement System II,* 91 F.3d 630, 635 (4th Cir.1996). With respect to NVCC, plaintiffs point to the admissions requirements set forth on NVCC's website as the independent source for their claim of entitlement to receiving a public education at NVCC, specifically the following language:

> If you have a high school diploma or the equivalent, or you are at least 18 years of age, and you are able to benefit from enrollment, you are eligible for admission to Northern Virginia Community College.

> \*　　\*　　\*　　\*　　\*　　\*

> Students are accepted on a first-come/first-served basis, except in restricted programs or when enrollment must be limited.[28]

These same admissions requirements also state, however, that

> [t]he College reserves the right to evaluate Applications for Admission and to refuse admission to applicants when it is considered to be in the best interest of the College or when there is sufficient reason to believe that they present a danger to themselves or to other members of the College community.

This reservation of right leaves NVCC with significant discretion to deny admission to any applicant, even if the applicant

has a high school diploma or the equivalent or is at least 18 years old and able to benefit from enrollment. As a result, these admissions criteria cannot serve as an independent source for plaintiffs' claim of entitlement. In *Kentucky Dep't of Corrections v. Thompson,* the Supreme Court held that Kentucky prison regulations did not give state inmates a liberty interest in receiving certain visitors. 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). In so holding, the Supreme Court noted that a state creates a liberty interest "by establishing 'substantive predicates' to govern official decision-making, and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." *Id.* at 462, 109 S.Ct. 1904. In addition, the Supreme Court articulated a requirement "that the regulations contain 'explicitly mandatory language,' *i.e.,* specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow, in order to create a liberty interest." *Id.* at 463, 109 S.Ct. 1904.

These principles are equally applicable to an analysis of property interests, and indeed, lower courts have so applied them. *See, e.g., Kim Construction Co., Inc. v. Bd. of Trustees,* 14 F.3d 1243, 1247 (7th Cir. 1994) (holding that constitutionally protected entitlement to a contract award was not created by publicized competitive bidding rules for awarding municipal contracts when rules themselves contained express reservation of city's right to reject any and all bids). In order to show that NVCC's admissions requirements create a constitutionally protected property interest, plaintiffs must show that if they meet the criteria for admission, NVCC is without discretion to deny them admission. *Id.* (citing *Thompson,* 490 U.S. at 464–65

---

28. *See* *http://www.nv.cc.va.us/admissions/re-* *quirements.htm* (last visited Feb. 18, 2004).

& n. 4, 109 S.Ct. 1904). This plaintiffs cannot show. While the admissions requirements on NVCC's website do provide certain "substantive predicates" to guide the admissions decision, they "lack the requisite relevant mandatory language." *Thompson,* 490 U.S. at 464, 109 S.Ct. 1904. Like the prison regulations at issue in *Thompson,* they "stop short of requiring that a particular result is to be reached upon a finding that the substantive predicates are met." *Id.* NVCC's admissions requirements are stated in permissive, rather than mandatory language: An applicant who meets the substantive criteria is *"eligible* for admission" to NVCC, he is not automatically admitted. Moreover, NVCC specifically "reserves the right ... to refuse admission to applicants when it is considered to be in the best interest of the College." Because NVCC advises all applicants of this reservation of right on its website, plaintiffs' claim of entitlement on the basis of "rules or mutually explicit understandings" creating a property right in admission to NVCC proves untenable. *See Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). As a result, the overall effect of the admissions requirements stated on NVCC's website is not such that plaintiffs "can reasonably form an objective expectation" that meeting the substantive requirements for admission would necessarily result in their admission. *Thompson,* 490 U.S. at 465, 109 S.Ct. 1904. Put another way, NVCC's admissions requirements "are not worded in such a way that an [applicant] could reasonably expect to enforce them against [NVCC]." *Id.*

Plaintiffs' argument with respect to JMU is equally unavailing. Plaintiffs' contend that because JMU's admissions office states on its website that the "committee reviews each applicant's qualifications individually, examining a variety of characteristics that indicate academic background and potential for success,"[29] JMU has created a constitutionally cognizable property interest in a fair and impartial admission decision. At the end of this process, however, JMU can deny admission to anyone "for any constitutionally permissible reason or for no reason at all."[30] *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983). There are thus no substantive limitations on the university's discretion to deny admission to an applicant. The Supreme Court has made clear that "[p]rocess is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Id.* at 250, 103 S.Ct. 1741. Because JMU may ultimately deny admission to anyone it chooses, "there is no such interest for process to protect." *Id.* It is clear that "[t]he State may choose to require procedures for reasons other than protection against deprivation of substantive rights,[31] of course, but in making that choice the State does not create an independent substantive right." *Id.* at 250–51, 103 S.Ct. 1741 (internal footnote omitted). Therefore, the fact that JMU chooses to follow certain procedures in reviewing applications for admission for reasons of its own does not create an independent prop-

---

**29.** *See http://www.jmu.edu/admissions/process/* (last visited Feb. 18, 2004).

**30.** JMU also advises applicants that "[t]he Admissions Committee has no equation or magic combination of grade point average and standardized test scores that ensures your admission to the university." *See*

*http://www.jmu.edu/admissions/process/* (last visited Feb. 18, 2004).

**31.** The process outlined on JMU's website of course serves a useful purpose—ensuring the admission of a well-rounded and diverse group of individuals.

erty right to those procedures for plaintiffs, or any other applicants to the university.

As a result, plaintiffs' due process claim must be dismissed.

### III.

In summary, for the reasons stated herein, the following conclusions are compelled:

(1) Defendants' motion to dismiss the complaint pursuant to Rule 12(b)(1), Fed.R.Civ.P., based on plaintiffs' lack of standing must be denied.

(2) Defendants' motion pursuant to Rule 12(b)(6), Fed. R. Civ. P., to dismiss the complaint's claim of a Supremacy Clause violation must be granted in part and denied in part. It must be denied insofar as the complaint alleges that defendants use other than federal standards to identify applicants who are illegal aliens. It must be granted in all other respects, as defendants may, consistent with the Supremacy Clause, deny admission to illegal aliens, provided that federal standards are used to identify which applicants are illegal aliens.

(3) Defendants' motion pursuant to Rule 12(b)(6), Fed. R. Civ. P., to dismiss the complaint's foreign commerce clause and due process claims must be granted.

An appropriate order will issue.[32]

---

[32] In the course of the hearing on this matter, the parties offered various public policy arguments in favor of granting or denying public college admission to illegal aliens. Arguments of this nature are properly presented to state legislatures and the Congress, not to the federal courts for the purpose of buttressing or refuting a Supremacy Clause preemption claim.