**EQUAL ACCESS EDUCATION,**
**et al., Plaintiffs,**

**v.**

**Alan G. MERTEN, et al., Defendants.**

**No. CIV.A. 103CV1113.**

United States District Court,
E.D. Virginia,
Alexandria Division.

July 14, 2004.

Luis Alberto Parada, Catherine Rebekkah Rowland, Arnold & Porter, Washington, DC, for Plaintiffs/Movants.

William Henry Hurd, Troutman Sanders LLP, Deborah Love Feild, James V. In-

gold, Jerry Kilgore, Alison Paige Landry, Maureen Fay Riley Matsen, Andrew Cameron O'Brion, William Eugene Thro, James D. Wright, Office of the Attorney General, Richmond, for Defendants/Respondents.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this case of first impression, two individual plaintiffs and one association challenge the admissions and enrollment policies of seven Virginia public post-secondary educational institutions on Supremacy Clause grounds.[1] More specifically, they allege that in implementing their policies to deny admission or enrollment to illegal aliens,[2] these institutions have violated the Supremacy Clause (i) by allowing state officials to make immigration status determinations; and (ii) by using standards different from those of the federal government to determine an applicant's immigration status, resulting in the misclassification of certain legal aliens as illegal aliens. At issue on cross-motions for summary judgment are threshold jurisdictional issues of standing and mootness, as well as the merits.

### I.

This suit was filed on September 2, 2003 on behalf of Equal Access Education ("EAE") and five anonymous plaintiffs who brought suit under various "Doe" pseudonyms.[3] By Memorandum Opinion and Or-

---

1. Defendants are the Presidents, Rectors, and Boards of Visitors of George Mason University ("GMU"), James Madison University ("JMU"), Northern Virginia Community College ("NVCC"), the University of Virginia ("UVA"), Virginia Commonwealth University ("VCU"), Virginia Polytechnic Institute and State University ("Virginia Tech"), and the College of William and Mary ("William & Mary"), who are sued in their official capacities.

2. The term "illegal alien" as used here means an alien present in the United States in violation of U.S. immigration laws and not otherwise in a period of stay authorized by the Attorney General.

3. On September 24, 2003, plaintiffs filed their First Amended Complaint.

der dated January 5, 2004, plaintiffs' motion to proceed by fictitious names was denied and, as a result, the individual plaintiffs were forced to identify themselves. *See Doe v. Merten*, 219 F.R.D. 387 (E.D.Va.2004). Plaintiffs' Second Amended Complaint, filed January 20, 2004, revealed that only two individuals ultimately chose to do so—Brian Marroquin and Fredy Vasquez.

In general terms, the Second Amended Complaint alleged that it was the admissions policy of seven public Virginia institutions—GMU, JMU, NVCC, UVA, VCU, Virginia Tech, and William & Mary—to deny admission to students based on *actual or perceived* illegal immigration status. Plaintiffs alleged that these admissions policies, coupled with the recommendations of the Virginia Attorney General to report students based on their perceived "illegal," "unlawful," or "undocumented" immigration status, had precluded and/or would preclude Marroquin, members of EAE, and many other qualified persons from applying to and/or attending the defendant institutions. Plaintiffs further alleged that other persons, including Vasquez and members of EAE, had applied to these institutions but were denied admission, and would continue to be denied admission, based on their actual or perceived illegal immigration status.

Based on these factual allegations, plaintiffs' complaint asserted three constitutional claims and a request for declaratory and injunctive relief. Count I alleged that, as a result of their admissions policies, defendants (i) were engaging in an impermissible regulation of immigration, (ii) were impermissibly occupying a field over which Congress had exclusive authority, and (iii) had impermissibly implemented a policy that was in conflict with the Constitution and other existing federal law on immigration, in violation of both the Supremacy Clause[4] and the Commerce with Foreign Nations Clause[5] of the Constitution.

Count II was a due process claim brought under 42 U.S.C. § 1983 against all defendants in which plaintiffs alleged that the enforcement or threat of enforcement of defendants' admissions policies deprived plaintiffs of their ability to apply to the defendant institutions in violation of the Due Process Clause and that defendants were committing this unconstitutional act under color of state law.

Count III sought declaratory relief pursuant to 28 U.S.C. § 2201 against all defendants regarding the constitutionality and enforceability of their admissions policies. Specifically, Count III sought a declaratory judgment that defendants' admissions policies violate the Constitution.

Defendants' motion to dismiss was ultimately decided by Memorandum Opinion and Order dated February 24, 2004. *See Equal Access Education v. Merten*, 305 F.Supp.2d 585 (E.D.Va.2004). Both the threshold jurisdictional questions of standing with respect to each plaintiff, as well as the merits, were addressed. Specifically, Marroquin, as an illegal alien, which he then claimed to be, was held to have standing to sue defendants because their alleged admissions policies aimed at excluding illegal aliens[6] would cause him "imminent injury, namely denial of admission *on the basis of his illegal immigration status*" and "[a]n injunction preventing the implementation of these policies would redress that injury." *Id.* at 594 (emphasis added). Indeed, Marroquin also had standing to sue defendants UVA and William & Mary,

---

4. U.S. Const., art. VI, cl. 2.

5. U.S. Const., art. I, cl. 3.

6. Plaintiffs' allegations as to the nature of these policies were taken as true at the motion to dismiss stage. *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993).

even though he had not applied for admission to their Fall 2004 class because he had "concrete plans to apply to both UVA and William & Mary in less than a year's time" and thus had "established that the injury he [would] suffer from the implementation of these institutions' alleged admissions policies [was] sufficiently imminent." *Id.* at 596–97.

Vasquez, an alien currently residing legally in the United States under a grant of Temporary Protective Status ("TPS"), did not have "standing to challenge admissions policies that only injure those who reside in this country illegally." *Id.* at 597. This did not end the analysis, however, for plaintiffs' complaint was construed to include an allegation that defendants' admissions policies deny admission to individuals they *wrongfully perceive* to be illegal aliens. Thus, "[a]s someone who holds TPS status, but was nonetheless allegedly denied admission to GMU and Virginia Tech based on his *perceived* illegal immigration status, Vasquez [had] standing to bring this claim." *Id.* at 597. Both Virginia Tech and GMU argued that Vasquez was not injured by the alleged admissions policies, but rather was denied admission to both schools for reasons having nothing to do with his immigration status, misperceived or otherwise. Yet, the conclusion ultimately reached was that "[a]t this early stage in the proceedings, before discovery ha[d] been completed," there existed "a genuine issue of material fact as to whether Virginia Tech's asserted reasons for denying admission to Vasquez [his GPA and SAT scores] [were] true." *Id.* at 598. Therefore, "at least for the time being," Vasquez had standing to challenge Virginia Tech's denial of his admission based on misperceived immigration status. *Id.* Similarly, a genuine dispute existed "as to whether Vasquez's transcript was received before or after the [GMU] deadline and thus whether GMU's proffered reason for denying admission to Vasquez [was] true." *Id.* at 599. Therefore GMU's motion to dismiss Vasquez for lack of standing was also "denied at this time." *Id.* Based on these rulings, EAE had associational standing because its members, Marroquin and Vasquez,[7] would have standing to sue in their own right. *Id.* at 600. The Court specifically noted, however, on more than one occasion "that a motion pursuant to Rule 12(b)(1), Fed.R.Civ.P., can be brought at any time and hence plaintiffs' standing may be challenged again on summary judgment." *See, e.g., id.* at 598 n. 10.

Reaching the merits, the Court held that defendants were not federally pre-empted from using federal immigration standards to deny admission to illegal aliens and that "such a policy does not violate the Supremacy Clause. Thus, to the extent the complaint claim[ed] otherwise, it [was] properly subject to threshold dismissal." *Id.* at 608. However, if plaintiffs were able to adduce facts at summary judgment or trial that showed that "defendants are using standards different from federal standards to classify aliens as legal or illegal … they may establish a conflict with federal law and hence a Supremacy Clause bar. Thus, dismissal on this issue [was] not warranted …." *Id.* Finally, both plaintiffs' foreign commerce clause claim and their due process clause claim were dismissed for the reasons stated in the memorandum opinion. *Id.* at 611, 614.

As a result, only one claim remains in this case at summary judgment, namely "whether defendants' admissions policies simply adopt federal standards, in which case they are not invalid under the Supremacy Clause, or instead create and apply state standards to assess the immigration status of applicants, in which case the

---

**7.** During the hearing on defendants' motion to dismiss, plaintiffs' counsel proffered that both Marroquin and Vasquez were members of EAE.

policies may run afoul of the Supremacy Clause." *Id.* at 603. State standards to assess immigration status may effectively exist if federal standards are misapplied in a systemic and pervasive manner. Given the previous ruling on the motion to dismiss, however, there is no doubt that the Supremacy Clause does not prevent public post-secondary institutions from denying admission or enrollment to illegal aliens. Put another way, these institutions may, consistent with the Supremacy Clause, deny admission or enrollment to aliens unlawfully in this country.[8]

## II.

■ The renewal of defendants' challenge to plaintiffs' standing at the summary judgment stage was contemplated in the initial ruling on the motion to dismiss and is invited by rule and established precedent because standing is a subject matter jurisdiction issue that can be revisited at any time. *See* Rule 12(h)(3), Fed.R.Civ.P. ("Whenever it appears by suggestion of the parties or otherwise that the court

lacks jurisdiction of the subject matter, the court shall dismiss the action."); *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir.1999) ("[A] federal court is obliged to dismiss a case whenever it appears the court lacks subject matter jurisdiction. Indeed, the absence of jurisdiction may be raised at any time during the case, and may be based on the court's review of the evidence.") (internal citations omitted).

■ The doctrine of standing derives from Article III of the Constitution, which limits federal court jurisdiction to "cases and controversies" and thus precludes the issuance of advisory opinions. The doctrine thus ensures that any given plaintiff is the proper party to bring a matter to federal court for adjudication. To establish standing, an individual plaintiff must show (i) that he has "suffered an 'injury in fact'— an invasion of a legally protected interest which is ... concrete and particularized [9] and ... actual or imminent, not conjectural or hypothetical"; (ii) "there must be a causal connection between the injury and the conduct complained of—the injury has

---

8. Plaintiffs also renewed the argument at summary judgment that mere examination of federal immigration documentation by admissions staff at state universities itself violates the Supremacy Clause. This argument has already been effectively rejected in the ruling on the motion to dismiss. There, plaintiffs argued that defendants had impermissibly invaded the field of immigration regulation, specifically in the area of classification and reporting of persons based on immigration status as governed by the INA. *Equal Access Education*, 305 F.Supp.2d at 604. Plaintiffs argued that, through the INA, Congress had delegated to immigration judges and the Department of Homeland Security the exclusive power to make independent determinations of immigration status, precluding all others, including state educators, from doing so. *Id.* To support their argument, plaintiffs relied on 8 U.S.C. § 1252(b) and 8 C.F.R. § 100.2(c)(2). *Id.* The Court rejected these arguments, holding that "[t]hese federal laws and regulations, however, do not support plaintiffs' contention" and that neither provision "preclude[d]

state institutions from using federal standards to deny admission to illegal aliens." *Id.* Put another way, there is no Supremacy Clause bar to state officials' examination of an applicant's federal immigration documentation to confirm the applicant's self-reported immigration status. A different result would obtain if state officials, for example, decided as a matter of policy that lawful permanent residents were illegal aliens in their eyes or that a "green card" was not sufficient federal documentation of lawful permanent resident status. The Supremacy Clause, however, does not bar state officials from asking a lawful permanent resident to produce federal documentation of his lawful permanent resident status in the United States, looking at that documentation, and thus confirming that the alien is what he says he is.

9. "Particularized" means that the injury "must affect the plaintiff in a personal and individual way." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 n. 1, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

to be 'fairly traceable to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court;' " and (iii) "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). These principles must be applied to the facts as developed in the summary judgment record.

## A. Marroquin

■ As noted, the sole remaining issue is whether defendants' admissions and enrollment policies violate the Supremacy Clause by failing to admit legal aliens because these policies adopt and implement non-federal standards or because, in seeking to adopt and implement federal standards, errors are so frequent and systemic as to amount effectively to the use of state and not federal standards. Given this, defendants argue that only a legal alien has standing to bring the one remaining claim in this case. This argument is valid for only a *legal alien* can suffer any injury from defendants' alleged policies. It is clear that the Supremacy Clause does not bar defendants from denying admission to illegal aliens. *See Equal Access Education,* 305 F.Supp.2d at 608. Therefore, even assuming that the defendant institutions have adopted state standards to assess immigration status, using those state standards to classify an applicant as illegal when federal standards likewise classify that applicant as illegal, would not cause that illegal alien applicant any cognizable injury. Moreover, a favorable decision here could not redress an illegal alien's

injury—denial of admission. This is so because an injunction barring defendants from using state standards and requiring them to use federal standards would do nothing to alter the fact that defendants could still deny admission to that illegal alien applicant. Therefore, if Marroquin is an illegal alien, he has no standing to bring the remaining aspect of this lawsuit and, and as a result, must be dismissed from this suit.

■ Throughout this litigation, plaintiffs have argued and conceded that Marroquin is an illegal alien. Now *for the first time,* however, plaintiffs contend that Marroquin is not in fact unlawfully present in the United States, and therefore he has standing to bring the one claim remaining in this lawsuit. Because plaintiffs argued otherwise earlier in this litigation, the applicability of the doctrine of judicial estoppel is a threshold issue. Judicial estoppel "is a doctrine that prevents a party who has successfully taken a position in one proceeding from taking the opposite position in [the same] or a subsequent proceeding." *United States v. Simmons,* 247 F.3d 118, 124 (4th Cir.2001) (internal quotation marks omitted).[10] In order for the doctrine to apply, "[t]he prior position must have been accepted by the court, and the party sought to be estopped must have 'intentionally misled the court to gain unfair advantage.' " *Id.* When defendants brought their motion to dismiss challenging, *inter alia,* plaintiffs' standing to bring suit, plaintiffs took the position that Marroquin was an illegal alien and they relied on Marroquin, and Marroquin alone, to pursue their claims[11] that it was unconstitutional for defendants to deny admission

---

**10.** *See also United States v. Krankel,* 164 F.3d 1046, 1053 (7th Cir.1998) ("When a party assumes a certain position in a legal proceeding and succeeds in maintaining that position, he may not thereafter assume a contrary position.").

**11.** The use of the word "claims" in the plural here and in the Court's previous memorandum opinion refers to the fact that plaintiffs' amended complaint encompassed three different claims that defendants' alleged policies of denying admission to illegal aliens was

to illegal aliens. The Court agreed with plaintiffs that Marroquin, as an illegal alien, had standing to bring such claims, but that conclusion was limited to plaintiffs' allegations that Marroquin would be denied admission based on his illegal immigration status. *See Equal Access Education,* 305 F.Supp.2d at 595 ("Simply put, Marroquin, *as an illegal alien,* is 'an object of the action ... at issue.'... Clearly, the alleged admissions policies of these institutions, which at this stage in the proceedings must be assumed to exist, will cause Marroquin injury, namely denial of admission *on the basis of his illegal immigration status.*") (emphasis added). Those claims, brought under the Supremacy Clause, the Foreign Commerce Clause, and the Due Process Clause, have since been dismissed from this lawsuit.

■ Plaintiffs, in their pleadings, argue that their previous characterization of Marroquin as unlawfully present was simply "a mistake," that their immigration expert [12] neglected to note that Marroquin was a minor and a derivative beneficiary of his father's pending asylum application. At the motion to dismiss stage, plaintiffs' characterization of Marroquin as an illegal

alien was not only useful, but necessary, to support the conclusion that both Marroquin and EAE had standing to pursue the primary allegation in the complaint, namely that defendants violate the Constitution by denying admission to illegal aliens. Yet, at summary judgment, the focus of this lawsuit has changed and it is now necessary that Marroquin be a legal alien to warrant a conclusion that he has standing to assert the complaint's remaining claim. It may, of course, be argued that judicial estoppel should apply here because plaintiffs' change in position concerning Marroquin's immigration status is not the result of an inadvertent mistake by their expert, but a calculated change to accommodate the current standing requirement. Yet, there is no persuasive reason to credit this cynical view. Moreover, it appears that plaintiffs' claim that the change of position simply corrects a mistake is made in good faith. It follows, then, that judicial estoppel does not apply here. *See King v. Herbert J. Thomas Memorial Hosp.,* 159 F.3d 192, 196–97 (4th Cir.1998) ("[J]udicial estoppel will not be applied where the party's inconsistent positions resulted from inadvertence or mistake.").

unconstitutional—one under the Supremacy Clause, one under the Foreign Commerce Clause, and one under the Due Process Clause. It does not, and did not, refer to plaintiffs' secondary claim that it was unconstitutional for defendants to deny admission to legal aliens who they misperceived to be illegal aliens. Clearly, only a legal alien would have standing to bring such a claim.

12. Plaintiffs submitted the affidavits of various immigration law experts on summary judgment. While the Court read and considered the affidavits, it viewed these expert opinions solely as additional arguments of plaintiffs' counsel, as expert testimony on the proper interpretation of domestic law is inappropriate. *See Teague v. Bakker,* 35 F.3d 978, 993 n. 21 (4th Cir.1994) ("Expert testimony as to the proper interpretation of applicable domestic law is inadmissible."); *United States*

*v. Gay,* 576 F.2d 1134, 1137 (5th Cir.1978) (holding that defendant's legal obligations under tax statute "were a matter for instructions from the trial court and not properly a subject for testimony by an expert witness"); *Marx & Co. v. Diners' Club Inc.,* 550 F.2d 505, 509–510 (2d Cir.1977) ("[E]xpert testimony on law is excluded because 'the tribunal does not need the witness' judgment .... [T]he judge (or the jury as instructed by the judge) can determine equally well ....") (quoting VII Wigmore on Evidence § 1952, at 81); Benjamin J. Vernia, Annotation, *Admissibility of expert testimony regarding questions of domestic law,* 66 A.L.R. 5th 135 (1999) ("Courts have historically refused to admit testimony explaining matters of domestic law, including statutory and regulatory law, as well as the interpretation of contracts and insurance policies.").

■ Given that plaintiffs are not barred from changing their position on Marroquin's immigration status, the merits of plaintiffs' current position must now be addressed. If Marroquin's status is illegal, as originally maintained, he has no standing to assert the remaining claim. On the other hand, if as now claimed, Marroquin's status is legal, he does have the requisite standing to sue.

Marroquin is a citizen of Guatemala and will turn eighteen (18) on July 20, 2004. He entered the United States as a child on a now-expired tourist visa and thus overstayed his authorized period of stay in the United States as stated on his I–94 form when he entered the United States. Recently, Marroquin filed a Form I–881 "Application for Suspension of Deportation or Special Rule Cancellation of Removal" with the INS pursuant to section 203 of the Nicaraguan Adjustment and Central American Relief Act of 1997 ("NACARA"), Pub.L. No. 105–100, 111 Stat. 2193, *amended by* Pub.L. No. 105–139, 111 Stat. 2644.[13] Section 203 of NACARA applies to certain Guatemalans, Salvadorans and nationals of former Soviet bloc countries who entered the United States by specified dates and applied for asylum or registered

for benefits under the settlement agreement in the class action lawsuit *American Baptist Churches v. Thornburgh,* 760 F.Supp. 796 (N.D.Cal.1991).[14] A Notice dated August 1, 2002, acknowledges the INS' receipt of the Form I–881 submitted by Marroquin. In the event Marroquin is granted NACARA 203 relief, he will be given lawful permanent resident status, effective as of the date that cancellation of removal is granted. 8 C.F.R. § 240.70(c).

To establish eligibility for special rule cancellation of removal, Marroquin must be, among other things, "inadmissible or deportable." 8 C.F.R. § 240.66(a). Indeed, "if the Service has made a preliminary decision to grant the applicant cancellation of removal under this subpart, the applicant shall be notified of that decision and asked to sign an admission of deportability or inadmissibility. The applicant must sign the concession before the Service may grant the relief sought." 8 C.F.R. § 240.70(c). Put another way, in order for Marroquin to obtain the NACARA 203 relief he now seeks, he must admit that he is an alien present in the United States in violation of U.S. immigration laws.[15] Any alien in the United States in violation of the INA or any other law of

13. Section 203 of NACARA allows qualified individuals to apply for suspension of deportation or for cancellation of removal ("NACARA 203 relief") under the standards similar to those in effect before the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat.3009–546. Whether an individual is applying for NACARA suspension of deportation or special rule cancellation of removal depends on whether or not that individual was placed in deportation proceedings before April 1, 1997. If the applicant was placed in deportation proceedings and those proceedings have not been terminated, then the applicant is applying for suspension of deportation. If the applicant is in removal proceedings, then the applicant is applying for special rule cancellation of removal. Individuals who have never been placed in deportation or re-

moval proceedings that are eligible to apply for NACARA 203 relief are automatically considered by USCIS to be asking for special rule cancellation of removal. There is no indication in the record that Marroquin was ever placed in deportation proceedings before April 1, 1997 (or, for that matter; removal proceedings after that date); therefore it is clear that his submission of Form I–881 seeks special rule cancellation of removal.

14. After October 2000, NACARA 203 also applies to their qualified family members and to certain individuals who have been battered or subjected to extreme cruelty by a lawful permanent resident, United States citizen, or by certain NACARA 203 beneficiaries.

15. It is possible for an alien to be removable and yet nonetheless in a period of stay author-

the United States is removable. *See* 8 U.S.C. § 1227(a)(1)(B). In addition, an alien who violates or fails to comply with any of the terms of his entry is subject to removal, as is any alien who fails to maintain the nonimmigrant or immigrant status that permitted his entry. *See* 8 U.S.C. § 1227(a)(1)(C). As the USCIS website makes clear to NACARA 203 applicants and others, "[e]ven if you presently have a work authorization card and a pending asylum application, you may still be inadmissible or deportable." [16]

By his own admission, Marroquin entered the United States legally on a B–2 tourist visa, but overstayed his B–2 visa status and remained in the United States after the expiration of that visa.[17] Once Marroquin's B–2 visa expired, his lawful status in the United States expired with it and since then, he has not obtained another lawful status in the United States, although he may soon obtain lawful permanent resident status if granted NACARA 203 cancellation of removal. Nor is Mar-

roquin currently in a period of stay authorized by the Attorney General. Thus, although the federal government is undoubtedly aware of Marroquin's presence in this country, he nonetheless is currently an illegal alien. The fact that Marroquin has a pending NACARA 203 application, is a derivative beneficiary of his father's asylum application (which has been pending for 14 years), has an employment authorization document, and is currently a minor (although not for much longer) does not alter this conclusion. Marroquin's pending NACARA 203 application and his father's pending asylum application both allowed Marroquin to apply for and receive an employment authorization document ("EAD").[18] *See* 8 C.F.R. § 274a.12(c)(9) (pending asylum application); 8 C.F.R. § 274a.12(c)(10) (pending NACARA application). While authorization to work in the United States implies some form of authorization to be in the United States, it does not necessarily mean that an alien enjoys lawful status in the United States.[19]

---

ized by the Attorney General. For example, a NACARA 203 applicant who has TPS during the pendency of his application must also admit that he is removable, despite the fact that his TPS status *temporarily* prevents him from being deported. *See* 8 C.F.R. § 244.10(f)(2)(i). As explained more fully below, however, Marroquin is both removable and not currently in a period of stay authorized by the Attorney General.

16. *See* http:// uscis.gov/graphics/services/residency/nacara_decision_making.htm (last visited June 23, 2004).

17. Any B–2 visitor for pleasure "may be admitted for not more than one year and may be granted extensions of temporary stay in increments. of not more than six months each ...." 8 C.F.R. § 214.2(b).

18. It is unclear from the record whether Marroquin obtained his EAD as a result of his father's pending asylum application or as a result of his own pending NACARA 203 application.

19. The validity of this conclusion is clear when one considers some of the other classes of aliens who are eligible to apply for employment authorization under federal law. For example, aliens subject to removal may have this action deferred for administrative convenience and, if so, may apply for employment authorization "if the alien establishes an economic necessity for employment." 8 C.F.R. § 274a.12(c)(14). In addition, an alien against whom a final order of deportation or removal exists and who is released on an order of supervision under the authority contained in § 241(a)(3) of the INA may be granted employment authorization in the discretion of the district director "if the alien cannot be removed due to the refusal due to the refusal of all countries designated by the alien or under section 241 of the Act to receive the alien, or because the removal of the alien is otherwise impracticable or contrary to the public interest." 8 U.S.C. § 274a.12(c)(18). Clearly, an alien against whom a final order of deportation or removal exists is does not have any lawful immigration status in the United States and is an illegal alien.

In sum, then, because Marroquin is removable from the United States and is not in a period of stay authorized by the Attorney General, Marroquin is an illegal alien under federal law.

Seeking to avoid this conclusion, plaintiffs rely on a number of federal immigration sources [20] to argue that because Marroquin is a minor and a derivative beneficiary of his father's pending asylum application, he is not currently an illegal alien. Plaintiffs reach this conclusion by referring to the construction of "unlawful presence" contained in § 212(a)(9)(B)(ii) of the INA, which states that

For purposes of this paragraph, an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled.

8 U.S.C. § 1182(a)(9)(B)(ii).

Section 212(a)(9)(B)(i)(I) provides that an alien who seeks admission to the United States after having been unlawfully present in the United States under this definition for a period of more than 180 days but less than 1 year is inadmissible for three years from the date of his previous voluntary departure from the United States. *See* 8 U.S.C. § 1182(a)(9)(B)(i)(I). Similarly, an alien who seeks admission after having been unlawfully present in the United States for one year or more is inadmissible for 10 years from the date of his voluntary departure from the United States. *See* 8 U.S.C. § 1182(a)(9)(B)(i)(II). The statute, however, lists four exceptions designating periods of time that should not be taken into account in determining an alien's period of unlawful presence in the United States for purposes of the 3– and 10–year bars to admission. *See* 8 U.S.C. § 1182(a)(9)(B)(iii). Those four exceptions include two that are relevant here—one for minors and one of aliens with pending asylum applications:

(iii) Exceptions

(I) Minors

No period of time in which an alien is under 18 years of age shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

(II) Asylees

No period of time in which an alien has a bona fide application for asylum pending under section 1158 of this title shall be taken into account in determining the period of unlawful presence in the United States under clause (i) unless the alien during such period was employed without authorization in the United States.

8 U.S.C. § 1182(a)(9)(B)(iii)(I) & (II). Plaintiffs essentially argue that these two exceptions alter the definition of unlawful presence in clause (ii) of the provision in such a way that an alien who is a minor or who has a pending asylum application is, by definition, always lawfully present in the United States. Properly read, however, the exceptions listed in clause (iii) do not alter the definition of unlawful presence, but merely exempt certain periods of time from the calculation of a period of unlawful presence. As the words of the

---

**20.** Plaintiffs rely on one statutory provision and three INS policy memoranda interpreting that provision: (i) Section 212(a)(9)(B) of the Immigration and Nationality Act ("INA"), codified at 8 U.S.C. § 1182(a)(9)(B); (ii) Memorandum for Regional Directors from Michael A. Pearson, Executive Assistant Commissioner (Mar. 3, 2000) ("Pearson Memorandum"); (iii) Memorandum for Regional Directors from Johnny N. Williams, Executive Associate Commissioner (June 12, 2002) ("Williams Memorandum"); and (iv) Memorandum from Paul W. Virtue, Acting Executive Associate Commissioner (June 17, 1997) ("Virtue Memorandum").

statute itself provide, those exempted periods of time shall not be "taken into account in determining the period of unlawful presence in the United States under clause (i)." Put another way, an alien under 18 years of age or with a pending asylum application who is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without having been admitted or paroled is still unlawfully present. For purposes of calculating the time period of that alien's unlawful presence under clause (i), however, the period of time in which the alien is under 18 or has a pending asylum application will not be counted against him. The fact that both exceptions specifically refer back to clause (i) necessarily limits the applicability of those exceptions to that clause, *i.e.,* calculation of unlawful presence for the purpose of the 3– and 10–year bars to admission. Therefore, even assuming these exceptions alter the definition of unlawful presence, they do so *only* for purposes of the 3– and 10–year bars to admission. The validity of this reading of

the statute and the corresponding invalidity of plaintiffs' reading is glaringly apparent when one considers that aliens who are minors can be, and indeed have been, removed from the United States. *See, e.g., Abay v. Ashcroft,* 368 F.3d 634 (6th Cir. 2004) (reviewing decision by Board of Immigration Appeals to deny alien under the age of 18 and her mother's consolidated applications for asylum and withholding of deportation subjecting both aliens to removal from the United States because they overstayed their tourist visas). If plaintiffs' view is accepted, an alien who is a minor is not unlawfully present, no matter how he entered or remained in this country. Taken to its logical conclusion, therefore, plaintiffs' argument necessarily implies that an alien child can never be deported. Clearly, this is not the case.

Moreover, the three INS policy memoranda cited by plaintiffs in support of their argument are of no avail.[21] None of these policy memoranda list pending NACARA 203 applications or pending asylum applications as periods of stay authorized by the Attorney General for purposes of INA

---

**21.** The Pearson Memorandum simply clarifies as a matter of INS policy that because the INS "has been unable to adjudicate a timely filed application for E/S [extension of stay] or C/S [change of status] within the 120–day period envisioned by Congress" in § 212(a)(9)(B)(iv) of the INA, the INS "determined that nonimmigrants who were admitted until a specific date and who apply for C/S or E/S and whose applications have been pending beyond the 120–day tolling period should be considered to be in a period of stay authorized by the Attorney General, if certain requirements are met." Because these requirements are the same as those for tolling under § 212(a)(9)(B)(iv) of the Act, the INS "further determined that the period of stay authorized by the Attorney General covers the E/S or C/S application for the entire period that it is pending." The Williams Memorandum "provides clarification on the period of stay authorized by the Attorney General with respect to applicants for temporary protected status (TPS) and deferred enforced departure

(DED)." This policy memorandum lists a series of immigration statuses that the INS has designated as a period of stay authorized by the Attorney General "[f]or purposes of section 212(a)(9)(B)(ii) of the Act, and for no other purpose or benefit under the Act." Finally, the Virtue Memorandum clarifies that § 212(a)(9)(B)(ii) of the INA "defines the term 'unlawfully present' for purposes of sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act." Thus, "[f]or purposes of these sections, an alien is deemed unlawfully present in the United States if present after the expiration of a period of stay authorized by the Attorney General or present in the United States without being admitted or paroled." The memorandum further states that "[f]or purposes of sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act only," the INS considers, *inter alia,* aliens under a current grant of TPS "to be present in the United States pursuant to a period of stay authorized by the Attorney General."

§ 212(a)(9)(B)(ii). *See, e.g.,* Williams Memorandum at 2 (listing 11 scenarios designated by the INS as periods of stay authorized by the Attorney General "[f]or purposes of section 212(a)(9)(B)(ii) of the Act, and for no other purpose of benefit under the Act"). Indeed, the Virtue Memorandum specifically lists "[a]liens with pending applications for cancellation of removal" as aliens *not* considered by the INS to be in a period of stay authorized by the Attorney General for purposes of INA § 212(a)(9)(B)(i).

As a result, it is clear that neither Marroquin's status as a minor or his father's pending asylum application alter the fact that he is both removable from the United States and not currently in the United States in a period of stay authorized by the Attorney General. Consequently, Marroquin is currently an illegal alien, although, if successful, his NACARA 203 application will confer lawful permanent resident status upon him. Thus, it follows that Marroquin has no standing to pursue this action.

## B. Equal Access Education

■■■■ Having determined that Marroquin does not have standing, it is now necessary to reassess EAE's standing to pursue this action as well. The principles that govern associational standing are well established. In *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Supreme Court held that

[A]n association has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2)

the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted or the relief requested requires the participation of individual members in the lawsuit.

432 U.S. at 343, 97 S.Ct. 2434. Because plaintiffs now rely exclusively on Marroquin to demonstrate that its members would have standing to sue in their own right, EAE's standing must fall along with Marroquin's. Nor can EAE rely on Fredy Vasquez or Bessy Guevara, both of whom are current members of EAE, to satisfy the first prong in the *Hunt* analysis because the undisputed record makes clear that both Vasquez and Guevara became members of EAE *after* this litigation began.[22] It is clear that standing must exist at the time suit is filed. *See Johnson v. Bd. of Regents of the Univ. Of Georgia,* 263 F.3d 1234, 1267 (11th Cir.2001) ("[S]tanding to sue is generally measured at the time of the complaint, with subsequent events generally analyzed under mootness principles."); *id.* (noting on summary judgment that "there has been no adequate showing that [plaintiff] actually had standing at the time of the complaint"); *Pederson v. La. State Univ.,* 213 F.3d 858, 870 (5th Cir.2000) (standing at time of trial implicates mootness and "has no bearing on the particular litigant's standing at the time suit was filed"); *Anjelino v. N.Y. Times Co.,* 200 F.3d 73, 88 (3d Cir.1999) ("Standing is established at the pleading stage . . . ."). The remaining identified members of EAE[23] are all United States citizens and plaintiffs do not

---

**22.** In this respect, the record reflects that Guevara joined EAE in January 2004, while Vasquez joined the organization in April 2004. This suit was filed on September 3, 2003.

**23.** By Order dated May 19, 2004, plaintiffs were barred from relying on any persons,

other than those EAE members who had already been identified, for purposes of EAE's associational standing or on the merits. *See Equal Access Education v. Merten,* Civil Action No. 1:03cv1113 (E.D.Va. May 19, 2004) (Order).

**668**

argue that any of these EAE members have been or will be injured by any of the defendant institutions' alleged policies, nor does any evidence in the record support such an argument. As a result, like Marroquin, EAE does not have standing to pursue this action. Because Marroquin and EAE must be dismissed from this lawsuit for lack of standing, their claims against defendants must also be dismissed,[24] leaving for consideration only Vasquez's claim against GMU and Virginia Tech.[25]

### C. Fredy Vasquez

■ Vasquez is a citizen of El Salvador who currently enjoys Temporary Protective Status ("TPS")[26] and is thus lawfully present in the United States for the duration of that status. Vasquez was denied admission to the Fall 2003 entering

24. As a result, JMU, NVCC, UVA, VCU, and William & Mary must be dismissed from this suit.

25. There is also another basis for dismissing NVCC, UVA, and William & Mary from this suit on grounds of mootness.. Marroquin applied to GMU, JMU, VCU, and Virginia Tech. He did not apply to NVCC, UVA or William & Mary. At the motion to dismiss stage, it was held that Marroquin had standing to sue UVA and William & Mary because he had "concrete plans to apply to both UVA and William & Mary in the near future—this year or by early January 2005, the application deadline for Fall 2005 admission to these institutions." *Equal Access Education*, 305 F.Supp.2d at 596–97. These "concrete plans" rendered Marroquin's injury from alleged policies denying admission to illegal aliens sufficiently imminent to confer standing. The record now reflects that Marroquin has been admitted to four other post-secondary educational institutions. One of those institutions is Virginia Tech and Marroquin has evinced his intention to attend Virginia Tech this fall by paying the required enrollment deposit to that university. Therefore, because there is no indication in the record that Marroquin intends to apply as a transfer student to UVA or William & Mary, his case against these schools is moot because no actual case or controversy exists anymore. *See United States Parole Commn. v. Geraghty*, 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) ("mootness [is] the doctrine of standing in a time frame. The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).") (internal quotation marks omitted). The same is true for NVCC, as the record reflects that Marroquin never in fact acted on his intention to apply to that institution this year.

26. TPS is a temporary immigration status granted to eligible nationals of designated countries (or parts thereof). As part of the Immigration Act of 1990 ("IMMACT 90"), Congress established a procedure by which the Attorney General may provide TPS to aliens in the United States who are temporarily unable to safely return to their home country because of ongoing armed conflict, the temporary effects of an environmental disaster, or other extraordinary and temporary conditions. Pursuant to the Homeland Security Act of 2002, the authority to designate a country, or part thereof, for TPS, and to extend or terminate TPS designations, was transferred from the Attorney General to the Secretary of Homeland Security. At the same time, responsibility for administering the TPS program was transferred from the former Immigration and Naturalization Service to U.S. Citizenship and Immigration Services ("USCIS"), a component of the Department of Homeland Security. During the period for which a country has been designated under the TPS program, TPS beneficiaries may remain in the United States and may obtain work authorization. However, TPS does not lead to permanent resident status. When the TPS designation of a country is terminated, beneficiaries revert to the same immigration status they maintained before TPS (unless that status had since expired or been terminated) or to any other status they may have acquired while registered for TPS. Accordingly, if an alien had unlawful status prior to receiving TPS and did not obtain any status during the TPS period, the alien reverts to unlawful status upon the termination of that TPS designation. *See* http:// uscis.gov/graphics/services/tps_inter.htm# whatistps (last visited July 1, 2004).

class of both Virginia Tech and GMU and he claims that occurred as a result of defendants' mistaken conclusion that he is without legal status in this country. Defendants contend the factual record cannot support such a claim. Specifically, according to the affidavit of Jacqueline L. Nottingham, Virginia Tech's Associate Director of Undergraduate Admissions, Virginia Tech denied Vasquez admission based on his SAT scores and his immigration status played no role in Virginia Tech's decision to deny him admission. GMU claims Vasquez's original application was not processed because it was incomplete, as his high school transcript did not arrive before the required deadline. It is on these bases and on a more complete factual record that GMU and Virginia Tech renew their challenge to Vasquez's standing to sue.

At the threshold dismissal stage, it appeared that Vasquez had standing to sue Virginia Tech because he had presented evidence that his GPA of 3.63 was higher than the average GPA of 3.59 for the overall 2002 entering freshman class and that ten percent of the Fall 2002 entering class had a verbal SAT score in the same range as Vasquez's, while six percent had a math SAT score in the same range.[27] It was specifically noted, however, that "[o]f course, this information does not mean that Vasquez should have been admitted to Virginia Tech, but it is enough *at this early stage in the proceedings, before discovery has been completed,* to create a genuine issue of material fact as to whether Virginia Tech's asserted reasons for denying admission to Vasquez are true." *Equal Access Education,* 305 F.Supp.2d at 598 (emphasis added). The Court further noted that it was "important to recognize that Vasquez does not have to show that he would have been admitted absent the challenged admissions policies; instead he must show only that the challenged policies precluded him from competing for admission on the merits." *Id.* The Court thus concluded that "*at least for the time being,* Vasquez has standing to challenge Virginia Tech's denial of his admission based on his misperceived immigration status," while specifically noting that Vasquez's standing could be challenged again on summary judgment. *Id.* (emphasis added); *id.* at 598 n. 10.

Now that discovery has been completed, Vasquez's standing bears reexamination. This discovery, which includes examination of Virginia Tech's admissions files and depositions of admissions officers, yields a different picture from what appeared at the threshold. There is no evidence whatever that any action taken by Virginia Tech was motivated in any way by Vasquez's immigration status. Thus, there is no deposition testimony to the contrary nor are there any notations or entries in Vasquez's admissions record. Nothing in the factual record contradicts Virginia Tech's sworn statements that Vasquez's immigration status played no role in the decision to deny him admission. The mere fact that Vasquez had a higher GPA than the average student in the Fall 2002 entering class and that ten percent of the Fall 2002 class had a verbal SAT score in the same range as Vasquez's while six percent had a math SAT score in the same range raises no triable issue of material fact as to whether Virginia Tech's asserted reason for denying admission to Vasquez is true.

This is especially true considering the undisputed evidence in the record demonstrating that Virginia Tech does not have a policy of considering immigration status when making admissions or initial enrollment decisions. According to Notting-

---

**27.** Presumably, therefore, ninety percent of the entering class had a verbal score higher than Vasquez's and ninety-four percent of the class had a math score higher than Vasquez's.

ham's affidavit, "Virginia Tech does not take immigration status into account in either admissions or enrollment." In its interrogatory responses signed by David R. Ford, Vice Provost for Academic Affairs, Virginia Tech does state that it previously had in effect "an unwritten practice that denied continued enrollment to students who did not establish that they were a current holder of a current valid visa, permanent resident card or other federal document establishing that the alien was in a period of authorized stay." This practice was put in effect by a former employee in the Undergraduate Admissions Office after September 11, 2001. According to the interrogatory response, the practice was in effect for the 2002 and 2003 academic years and "was abandoned once it was realized that this practice was not formally approved as university policy."

Under this former practice, Virginia Tech considered all applicants for admission and enrollment, regardless of their immigration status. Applicants who met the educational requirements and provided the required financial certification, but did not provide the requested immigration documentation, were permitted to enroll at Virginia Tech. However, if the student did not provide evidence of current valid immigration or visa status prior to the commencement of the second semester, they were not permitted to continue enrollment.

Again, according to David Ford's deposition testimony, this practice ceased "at least a couple semesters ago." The evidence is clear, therefore, that Virginia Tech does not currently have a policy of denying admission or enrollment to illegal aliens,[28] and its previous practice of denying continued enrollment to aliens who could not provide immigration documentation was abandoned before this lawsuit was filed. While the former practice was apparently in effect in 2002—the year Vasquez applied for admission to Virginia Tech—that practice would not have resulted in Vasquez's denial of admission, even had he not produced federal documentation of his TPS status. Indeed, the practice only prevented a student's *continued* enrollment after completion of one semester. This, then, is further evidence that Vasquez was denied admission to Virginia Tech based on his SAT score, not his immigration status. Thus, uncontradicted evidence reflects that Virginia Tech did not consider immigration status in admissions or enrollment for the first semester.[29] As a result, Virginia Tech is entitled to summary judgment because Vasquez lacks standing and, alternatively, on the merits.[30]

■ Vasquez also argues that he was denied admission to GMU based on his immigration status when he applied for admission to the Fall 2003 class. According to the affidavit of Andrew Flagel, GMU's Dean of Admissions, GMU did not process Vasquez's initial application because GMU did not receive his high school transcript in a timely fashion. More specifically, his transcript was not received by

---

**28.** The fact that Marroquin has been admitted to Virginia Tech and indeed has paid his enrollment deposit to that institution is further evidence of this point.

**29.** As noted, the record reflects that Virginia Tech does not now consider immigration status at all in making admissions or enrollment decisions.

**30.** For this reason, plaintiffs' last-minute Motion for Voluntary Dismissal Without Prejudice with respect to Virginia Tech, filed the morning of the summary judgment hearing in this case, must be denied. Because it is now clear (i) that Vasquez lacks standing to sue Virginia Tech and (ii) that Virginia Tech does not have a policy of denying admission or enrollment based on immigration status, it is both proper and warranted that Virginia Tech be dismissed from this suit *with prejudice* at this time.

GMU until May 12, 2003—after the date the Fall 2003 freshman class was closed. Flagel states that Vasquez's immigration status played no role in GMU's decision not to process his original application. At some point this year,[31] Vasquez received word that GMU had reactivated his application for admission in Fall 2004 and this time, he was admitted. Vasquez intends to attend GMU in the Fall.

At the motion to dismiss stage, GMU's motion to dismiss Vasquez for lack of standing was denied because Vasquez had submitted a declaration in which he stated that he took prompt steps to send GMU his transcript after receiving a letter from GMU dated February 7, 2003 informing him that his application was incomplete because the university did not have a copy of his transcript. According to Vasquez, the high school transcript clerk assured him that she had already sent a copy of his transcript to GMU. The clerk then made another copy of his transcript, placed it in a sealed envelope addressed to GMU's admissions office along with other documents, and asked Vasquez to place the envelope in the mailbox, which Vasquez claims he did immediately. *Id.* at 598. Plaintiffs also submitted a document purportedly from Vasquez's high school showing that the transcript clerk sent Vasquez's transcript to GMU on February 12, 2003, although this document was never authenticated by affidavit. *Id.* As a result, the Court concluded that, at that time and prior to discovery, it appeared that "a genuine dispute exists as to whether Vasquez's transcript was received before or after the deadline and thus whether GMU's proffered reason for denying admission to Vasquez is true." *Id.* at 599.

Since deciding the standing issue at the motion to dismiss stage, further evidence has been adduced confirming May 12, 2003 as GMU's receipt date of Vasquez's transcript. This occurred in the deposition of GMU's Dean of Admissions, Andrew Flagel, who clarified that the coding on Vasquez's file indicated that Vasquez's application was originally processed in January 2003, that a mailing was sent out on February 7, 2003 requesting his transcript, and that his transcript was actually received on May 12, 2003. Thus records kept in the ordinary course of GMU's business show that Vasquez's transcript was received by GMU on May 12, 2003.

More importantly, there is no record evidence whatever to suggest that Vasquez's immigration status played a role in the decision to deny him admission to GMU's Fall 2003 class. GMU's admissions policy at the time was that an applicant seeking admission was required to be either lawfully present in the United States or seeking an immigration status which, if granted, would result in lawful presence. The record suggests that GMU required alien applicants to submit federal documentation of their self-reported immigration status. There is also evidence in the record that the processing staff in GMU's admissions office considers applications from students with TPS status as "out-of-state" and moves them forward in the admissions process.[32] Therefore, the additional evidence now in the record makes clear that applicants with TPS who provide GMU with federal documentation of that status are eligible for admission to GMU. In the face of this evidence, there is no basis to conclude that GMU's transcript explanation is pretextual. Therefore, be-

---

**31.** The record is unclear as to when exactly this occurred.

**32.** The only evidence in the record of an instance where this did not occur, is the application of Bessy Guevara. Significantly, however, there is no evidence in the record that Guevara ever submitted federal documentation *of her TPS status* to GMU (although she did submit federal documentation of a pending NACARA 203 application).

cause Vasquez lacks standing, GMU is now entitled to summary judgment.

It is also worth noting that the only evidence in the record that suggests GMU may misperceive certain legal aliens as illegal comes in the form of responses from various admissions personnel to hypothetical questions during depositions. For example, Fran Herrity, GMU's Associate Dean of Admissions and Chief Transfer Officer, while responding to a hypothetical scenario, stated that GMU might not process the application of a student who has applied for adjustment of status and is therefore, in plaintiffs' view, "in a period of stay authorized by the Attorney General" according to INS policy memoranda. While this may or may not have occurred in fact, it is ultimately irrelevant because only a student who has applied for adjustment of status would have standing to challenge such a practice. Vasquez has TPS status. He cannot challenge GMU policies or practices that do not injure him, even if those practices may injure other aliens in the United States lawfully. In the circumstances, therefore, to rule on the constitutionality of such a practice would clearly be an improper advisory opinion.[33]

■ Except with respect to Virginia Tech, nothing in this memorandum opinion takes a position on the merits issues in this case. This is as it should be for our Constitution and settled precedent make clear that "federal courts do not sit to give advisory opinions, nor to render decisions which can offer no relief to any party." *Goland v. Central Intelligence Agency*, 607 F.2d 339, 376 (D.C.Cir.1978). The Constitution limits the jurisdiction of federal courts to cases or controversies. *See* U.S. Const., art. III, § 2. And, much of the very evidence submitted by plaintiffs on summary judgment in this case highlights the wisdom of this constitutional limitation. Assessing an institution's policies or practices by reference to hypothetical scenarios is both impractical and a waste of judicial resources. It is not the business of federal courts to opine on the constitutionality of

---

**33.** Because Vasquez's application to GMU was reactivated and he has been admitted to GMU for Fall 2004, GMU also argues that Vasquez lacks standing for that reason alone. This argument fails because Vasquez's admission to GMU is an event that occurred subsequent to the filing of the complaint and, therefore, must be analyzed under mootness principles. *See Johnson*, 263 F.3d at 1267 (11th Cir.2001) ("[S]tanding to sue is generally measured at the time of the complaint, with subsequent events generally analyzed under mootness principles."). Like the closely-related principle of standing, "[t]he inability of the federal judiciary to review moot cases derives from the requirement of Art. III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy." *DeFunis v. Odegaard*, 416 U.S. 312, 316, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971)) (internal quotation marks omitted). An actual case or controversy must exist at all stages of federal court proceedings. Therefore, if events subsequent to the filing of the case resolve the dispute, the case should be dismissed as moot. There is an exception to the mootness doctrine, however, if a defendant voluntarily ceases the allegedly improper behavior but is free to return to it at any time. Only if there is no reasonable chance that the defendant could resume the offending behavior is a case deemed moot on the basis of voluntary cessation. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). In these circumstances, a case could only be moot "if the defendant can demonstrate there is no reasonable expectation that the wrong will be repeated. The burden is a heavy one." *Id.* at 633, 73 S.Ct. 894. A promise not to resume the offending practice is not enough. *Id.* Thus, the voluntary cessation exception to the mootness doctrine appears to encompass GMU's voluntary decision to admit Vasquez for Fall 2004, as well as GMU's new policy, adopted June 4, 2004, to make admission and enrollment decisions without regard to an applicant's immigration status.

injuries of persons not before the court, or to opine on the constitutionality of injuries that have yet to occur and that, indeed, may never occur. While it is true that the factual record reflects that some defendants have made mistakes in determining an applicant's immigration status,[34] the issue of whether these mistakes are systematic so as to amount effectively to the creation of state standards is not reached in light of the standing and summary judgment rulings reached here.

Finally, nothing in this memorandum opinion, or in the related dismissal stage opinion, is intended to indicate any view on whether defendants should or should not, as a matter of public policy, deny admission to illegal aliens. There is no Supremacy Clause bar to these institutions' offering or denying admission to illegal aliens, provided, with respect to the latter, that they use only federal standards in doing so and do not systemically or consistently misapply those standards. Also, no opinion is expressed here as to what, if any, remedy a legal alien may have if he is denied admission based on a defendant's misperception as to his legal immigration status.

### III.

Accordingly, for the reasons stated, defendants' motion for summary judgment must be granted and plaintiffs' motion for summary judgment must be denied. In addition, plaintiffs' Motion for Voluntary Dismissal Without Prejudice with respect to Virginia Tech must also be denied.

An appropriate order has issued.

---

**34.** It is worth noting that some defendants, as the record suggests, have responded to plaintiffs' concern about the potential for mistakes by sensibly instituting training for admissions officers and putting in place an appeal process for applicants who claim they have been misclassified as illegal aliens.